*Decisions will be entered under Rule 50.*

GROSSMAN & SONS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT
ROSE WIPING CLOTHS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1717–65, 1718–65. Filed April 11, 1967.

*H. Thompson Nicholas, Jr.,* and *Roger K. Powell,* for the petitioners.

*W. Dean Short,* for the respondent.

DRENNEN, *Judge:* In these consolidated proceedings, respondent determined deficiencies in petitioners' income tax for the years stated as follows:

| Docket No. | Petitioner | Taxable year ended— | Deficiency |
|---|---|---|---|
| 1717–65 | Grossman & Sons, Inc | Mar. 31, 1959<br>Mar. 31, 1960<br>Mar. 31, 1961<br>Mar. 31, 1962 | $2,416.86<br>2,019.68<br>3,859.55<br>26,673.55 |
| 1718–65 | Rose Wiping Cloths, Inc | Aug. 31, 1959 | 1,826.15 |

The notice of deficiency in docket No. 1717–65 made several adjustments in petitioner's taxable income for the years involved but in its pleadings petitioner raised only two issues, one involving the reduction of income by, or the deductibility of, the $100,000 petitioner agreed to pay the United States in 1959 in settlement of various claims, mentioned more in detail below, and the second one involving the deductibility of office salaries and payroll taxes in the amount of $27,588.20 for the fiscal year 1962. Petitioner does not mention the latter issue on brief and we consider that it has either conceded or abandoned the issue.[1]

The notice of deficiency in docket No. 1718–65 also made several adjustments in petitioner's taxable income for its fiscal year 1959, but in its pleadings petitioner raised only one issue, being the disallowance of a deduction for certain legal fees paid by petitioner in its fiscal year 1959. Respondent concedes this issue on brief, so there is no issue for the Court to decide in docket No. 1718–65. However, a Rule 50 computation will have to be made to determine the amount of the deficiency in tax, if any, resulting from the concessions of the parties.

Thus the only issue remaining for our decision is whether an amount of $100,000 which petitioner, Grossman & Sons, Inc., in docket No. 1717–65, agreed to pay to the United States in settlement of a claim of the United States under 31 U.S.C. secs. 231–233, commonly known as the False Claims Act, and other litigation pending between petitioner and the United States arising out of the same contracts, is excludable from petitioner's gross income for 1959 as a sales return or allowance, or is deductible by petitioner as an ordinary and necessary business expense under section 162(a), or as a loss under section

---

[1] Counsel for respondent, in his opening statement, stated that petitioner had conceded this issue. The response of counsel for petitioner was not entirely clear, but his failure to discuss the issue on brief confirms respondent's understanding with respect to this issue.

165, or under any other section of the Internal Revenue Code of 1954. Allowance of the exclusion or deduction would result in an operating loss for petitioner for its fiscal year 1959 which might also affect its taxable income for other years here involved.

The stipulated facts are incorporated herein by this reference.

Grossman & Sons, Inc. (hereinafter referred to as Grossman, Inc., or petitioner), is an Ohio corporation with its principal office located in Columbus, Ohio. Its income tax return for the taxable year ended March 31, 1959, was filed with the district director of internal revenue, Columbus, Ohio, and its income tax returns for the taxable years ended March 31, 1960, 1961, and 1962, were filed with the district director of internal revenue, Cincinnati, Ohio. Grossman, Inc., kept its books and filed its returns for the periods here involved using the accrual method of accounting.

Rose Wiping Cloths, Inc. (hereinafter referred to as Rose, Inc.), is an Ohio corporation with its principal office located in Columbus, Ohio. Its income tax return for the taxable year ended August 31, 1959, was filed with the district director of internal revenue, Columbus, Ohio. Rose, Inc., kept its books and filed its return for the period here involved using the accrual method of accounting.

Grossman & Sons, Inc., and Rose Wiping Cloths, Inc., will sometimes hereinafter be referred to as petitioners.

Arnold, Herbert, and Marvin Grossman are brothers and were president, vice president, and secretary-treasurer, respectively, of Grossman, Inc., during the years in question. They also owned all of its stock.

Arnold, Herbert, and Marvin Grossman were the principal officers, stockholders, and directors of Rose, Inc., during the taxable years involved herein. Their father, Ben Grossman, also owned some of its stock during the years 1952 through 1956. Also, Herbert Romanoff was a second vice president of Rose, Inc., until he left its employment in 1952.

Grossman, Inc., is primarily engaged in business as a wastepaper and rag broker. It also processes some grades of wastepaper. The principal business of Rose, Inc., is that of a processor-manufacturer of wiping cloths for the industrial trade.

During the years 1950 through 1952, petitioners entered into certain contracts under which they were to supply wiping cloths to the U.S. Navy Department (referred to herein as the Navy). These contracts were executed on petitioners' behalf by their officers. The following schedule lists the contracts which petitioners entered into with the Navy, the date of the contract, and the amount to be paid petitioners under the contract.

| Contract | Date | Amount |
|---|---|---|
| N140–155s–18123B_____ | Sept. 6, 1950, as amended_____ | $14, 540. 47 |
| N140–155s–20439B_____ | Jan. 6, 1951, as amended_____ | 105, 000. 41 |
| N140–155s–29221B_____ | July 6, 1951_____ | 191, 529. 30 |
| N140–155s–30636B_____ | Sept. 28, 1951, as amended_____ | 76, 309. 99 |
| N140–155s–30662B_____ | Oct. 1, 1951, as amended_____ | 36, 118. 78 |
| N140–155s–35038B_____ | Jan. 5, 1952, as amended_____ | 616, 251. 47 |
| N140–155s–37084B_____ | Mar. 13, 1952, as amended_____ | 129, 246. 32 |

On or about November 18, 1953, an indictment was returned against Ben, Marvin, Arnold, and Herbert Grossman, and Herbert Romanoff in the U.S. District Court for the Southern District of Ohio, Eastern Division, charging that they had conspired, in violation of 18 U.S.C. sec. 371, to violate the provisions of 18 U.S.C. secs. 287 and 1001 in the performance of the contracts which petitioners had with the Navy.

This indictment charged that the above-named officers of petitioners, identified therein as defendants, had conspired and agreed together—

to submit to the United States Navy, an agency of the United States, bids for the furnishing to said United States Navy of certain wiping cloths and, upon the acceptance of such bids by the United States Navy to furnish to said department wiping cloths which would be inferior to and would not meet the specifications prescribed in such bids and the contracts entered into pursuant thereto, * * *

by various means, including shipping bales of cloths that would be underweight and would not consist of cloths which were "soft absorbent cotton fabrics" as prescribed in the contracts, switching bales that were to be inspected, unauthorized stamping of bales as having been inspected, and submitting bills to the Navy calling for full payment, representing thereby that the contracts had been fully performed. This indictment then set forth several specific acts of the parties mentioned therein to effect the objects of the conspiracy.

After a trial by jury, Ben, Marvin, Arnold, and Herbert Grossman, and Herbert Romanoff were each found guilty of the charge contained in the aforesaid indictment and received various fines and sentences ranging from a $10,000 fine and 2 years in prison for Ben and Herbert Grossman to a $1,000 fine for Romanoff. None of the prison sentences were executed; instead the sentences were suspended and the defendants were placed on probation.

On October 3, 1956, Grossman, Inc., filed suit against the United States in the U.S. Court of Claims for $10,449.22, an amount alleged to be due Grossman, Inc., by virtue of a contract entered into with the Navy. Likewise on October 3, 1956, Rose, Inc., filed suit against the United States in the U.S. Court of Claims for $10,771.65, which amount was alleged to be due Rose, Inc., by virtue of contracts entered into with the Navy.

At this time there was also pending before the Renegotiation Board an action brought by the Government against Rose, Inc., for the recovery of excessive profits in the amount of $3,921.68.

On October 12, 1956, a civil suit was instituted in a U.S. District Court in Ohio by the United States against Grossman, Inc., and Rose, Inc., Ben, Arnold, Marvin, and Herbert Grossman, and Herbert Romanoff to recover damages and forfeitures pursuant to the provisions of 31 U.S.C. secs. 231–233. The complaint in this action charged that Grossman, Inc., and Rose, Inc., had entered into a series of contracts (being the same contracts involved in the criminal proceedings against the individuals heretofore mentioned) with the Navy to supply wiping cloths to the Navy and had entered into a conspiracy to defraud the United States by submitting bids to furnish to the Navy certain wiping cloths, and furnishing said cloths to the Navy, which would be inferior to and would not meet the specifications prescribed in such bids and the contracts entered into pursuant thereto. The schemes and devices employed by the defendants to accomplish this purpose were specified in the complaint and were the same as those set forth in the indictment issued against the individuals mentioned above. The complaint further alleged that as a result of the conspiracy, and the schemes and devices used, the defendants submitted to the Navy bills or vouchers for payment all of which were false or fraudulent because, as defendants well knew, the wiping cloths claimed to have been delivered were defective and not in conformity with the contractual requirements, and by payment of these false and fraudulent claims presented, the United States suffered damage. The prayer of the complaint demanded judgment against the defendants for "double the damages sustained by the United States * * *, plus the sum of $2,000 for each and every false * * * claim * * * presented * * * [to] the United States * * * for payment * * * plus costs of this action." No amount of damages were specified in the complaint.

The civil action in the District Court was contested by petitioners. Among other things, a motion was filed for a more definite statement to require the Government to set forth the exact amount of its damages. The District Court sustained the motion by order entered June 7, 1957, and thereafter the United States filed an amendment to the complaint alleging such damages in the amount of $233,199.34, and demanding judgment for double the amount of those damages plus $2,000 for each false claim presented (which totaled approximately 100) as provided in sections 3490 and 5438 of the Revised Statutes. (Sections 231–233 of Title 31 of the U.S. Code are derived from these statutes.)

On April 25, 1958, Grossman, Inc., and the four individual Grossman defendants in the District Court action filed an answer to the complaint as amended denying the substantive allegations of the complaint as amended but admitting having entered into a series of contracts with the Navy.[2]

After the District Court action was filed and had been pending for some time it became apparent to the Grossmans that if a disposition could be made of all the litigation, that is, the two Court of Claims cases, the renegotiation case, and the District Court case, it would be advantageous to them in several respects. The District Court action appeared to involve protracted litigation. Both a Columbus, Ohio, and a Washington, D.C., law firm had been retained to defend the action brought by the Government and the costs of defense were increasing without any expectation of disposing of the litigation by trial in the immediate future. The time and effort expended by officers and employees of petitioners to acquaint their attorneys with the factual complexities of the various legal actions were taking substantial time and effort away from petitioners' business purpose and consequently the day-to-day business activities were neglected to a considerable extent. The pendency of the suit in the District Court against petitioners was adversely affecting the financial condition of petitioners and their bank credit, and it was essential to have good bank credit in the normal operation of petitioners' business. In addition, petitioners recognized that the Government might well be able to prove that a substantial number of the wiping cloths involved (under the contracts with the Navy) in the suit before the District Court possibly would not meet the technical specifications set forth in the contracts.

The first discussion concerning a possible settlement of the various pending legal controversies between petitioners and the United States occurred in April 1957 with Justice Department attorneys in Washington, D.C. The Government made a settlement offer or demand of $160,000 for damages and an additional $120,000 for forfeitures in the District Court case under the False Claims Act, or a total of $280,000. This proposition was rejected by petitioners. Subsequent to the April 1957 conference, a settlement offer was made by petitioners to the Department of Justice in the amount of $35,000, and the Government held this offer to be unacceptable.

As a result of negotiations between petitioners' representatives and the Department of Justice, under date of July 1, 1958, in a letter prepared by petitioners' attorneys and directed to the U.S. attorney, Co-

---

[2] The record in this Court does not reveal whether separate answers to the complaint were filed by Rose, Inc., and Romanoff.

lumbus, Ohio, petitioners made an offer to settle the District Court, the two Court of Claims, and the renegotiation cases on the basis set forth therein. The letter read as follows:

As attorneys for Grossman and Sons, Inc. and Rose Wiping Cloths, Inc., we hereby propose a settlement of certain contingent claims arising from contracts hereinafter specified.

In the ordinary course of its business Grossman and Sons, Inc., and [sic] Ohio corporation (herein called "Grossman"), entered into a series of business contracts with the Department of the Navy, an agency of the United States of America (herein called "Buyer"), during the period of September 6, 1950, through July 25, 1952. An identifying description of such contracts is set forth in attached Exhibit A. Basically, these contracts provided that Grossman would sell quantities of wiping cloths to Buyer and in consideration therefor, Buyer would pay Grossman under the terms of the contracts. The contracts further contained particular sales terms guaranteeing the quality, utility and composition of the products to be sold. Pursuant to these contracts, Grossman sold and delivered such products to Buyer and Buyer, accordingly, paid Grossman. The wiping cloths delivered by Grossman were produced by Grossman and by Rose Wiping Cloths Company, a partnership composed of Ben Grossman, Arnold Grossman, Marvin Grossman and Herbert Grossman, which partnership was succeeded by Rose Wiping Cloths Inc., an Ohio Corporation organized in September, 1952, hereinafter referred to as "Rose".

After the performance of the aforesaid contractual duties by the respective parties, Buyer asserted asserted [sic] questions as to whether the delivered products fully satisfied certain contract sales specifications and quality warranties. Buyer then claimed and continues to claim that certain specifications and sales warranties were not in all instances completely satisified [sic].

Grossman and Rose unequivocally deny and continue to deny Buyer's claim that any provisions of the respective sales contracts have been breached. On the contrary, Grossman and Rose assert full compliance with all details of the contracts. Grossman and Rose, moreover, assert that any validity of Buyer's claim, which validity Grossman and Rose deny, would stem from a purported common law breach of contract and that any damages which Buyer might recoup would only be validly promised [sic] upon an alleded [sic] common law breach of contract.

While Grossman and Rose believe they are not liable for Buyer's claimed contract breaches, the respective Boards of Directors of each corporation have recognized the attendant uncertainty which a contingent liability causes any business enterprise in the conduct of its business. Any such substantial contingent claim, even though unfounded, is a serious deterrent to the growth and expansion of a corporate business. Grossman and Rose's respective Boards of Directors have analysed their corporate business needs for stability and financial certainty in the current and future operations of the companies, especially when coupled with the probable substantial expense of defending such contingent contract claims. In this connection, an additional important factor is the uncertainty with respect to the time within which all of these controversies could be resolved. Therefore, even though Grossman and Rose believe Buyer's claim to be completely unfounded, their respective Boards of Directors are willing to compromise these claims as an ordinary and necessary expense in conducting their businesses on the terms as herein stated. It is the position of Grossman and Rose

that any compromise payments are solely the obligations of such corporations and such payments have the singular character of common law contractual damages arising from the business of the corporations in performing the duties of Grossman under the several contracts. Further, the officers and stockholders of Grossman and Rose, including Ben Grossman, Arnold Grossman, Marvin Grossman and Herbert Grossman, are nowise personally accountable or liable for any purported claims arising from the performance of these several contracts, as any such purported claims or liabilities might only arise from the contractual relationship between Grossman and Rose and Buyer.

Consequently, Grossman and Rose offer to settle for the sum of One Hundred Thousand Dollars ($100,000.00) all claims of the Buyer arising from the alleged furnishing of defective materials by Grossman and Rose pursuant to the contracts listed in attached Exhibit A and any and all claims of whatever nature which the Buyer now has or may have against either of said corporations and any officers and stockholders thereof arising out of such contracts and any claims of the Buyer against any of said corporations or individuals arising from an order of the Renegotiation Board relating to Rose Wiping Cloths Company with respect to the fiscal year ending August 31, 1951. The One Hundred Thousand Dollars ($100,000.00) is to be paid in the following manner. The Buyer, the United States Government, is indebted to Rose for the sum of ten thousand, four hundred ninety-eight dollars and forty-six cents ($10,498.46), which is the subject of an action now pending in the United States Court of Claims, being *Rose Wiping Cloths, Inc. v. United States of America*, No. 428–56. The United States Government is also indebted to Grossman for the sum of ten thousand, four hundred forty-nine dollars and twenty-two cents ($10,449.22), which is the subject of an action now pending in the United States Court of Claims, being *Grossman & Sons, Inc. v. United States of America*, No. 427–56. The total of the Buyer's obligations involved in the two court of Claims cases is twenty thousand, nine hundred forty-seven dollars and sixty-eight cents ($20,947.68). On the other hand, the Buyer has a claim against Rose (upon the theory that Rose is the successor of Rose Wiping Cloth Company referred to above) arising from an order of the Renegotiation Board with respect to the fiscal year ended August 31, 1951, in the amount of three thousand, nine hundred twenty-one dollars and sixty-eight cents ($3,921.68). The result is that the net indebtedness of the Buyer to Rose and Grossman is seventeen thousand, twenty-six dollars ($17,026.00).

Grossman and Rose, therefore, agree upon acceptance of this offer to pay the Buyer twenty thousand dollars ($20,000.00) by releasing the Buyer from its obligations involved in the two cases pending in the Court of Claims, which cases, including any counterclaims filed therein, the parties agree will be dismissed with prejudice, and by Grossman paying to the Buyer in addition, the sum of two thousand, nine hundred and seventy-four dollars ($2,974.00) in cash. The balance of eighty thousand dollars ($80,000.00) will be paid by Grossman over a period of eight (8) years at the rate of ten thousand dollars ($10,000.00) per year, each annual payment to be made on or before January 15 of each year, the first such payment being due on or before January 15, 1959.

Upon acceptance of this offer, the Buyer releases Grossman and Rose and the officers and stockholders of Grossman and Rose, including Ben Grossman, Arnold Grossman, Marvin Grossman and Herbert Grossman, from any and all claims of the Buyer arising from the alleged furnishing of defective materials by Grossman and Rose pursuant to the contracts listed in attached Exhibit A and any and all claims of whatever nature which the Buyer now has or may have against either of said corporations and any officers and stockholders thereof

arising out of such contracts and any claims of the Buyer against any of said corporations or individuals arising from the above described order of the Renegotiation Board and all claims involved in the above described litigation in the Court of Claims and all claims involved in an action now pending in the Federal Court at Columbus, Ohio. All litigation between the Buyer and Grossman, Rose and the above-named individuals, including the action pending in the Federal Court at Columbus, Ohio, will be dismissed with prejudice, without cost to any party.

Very truly yours,

On July 2, 1958, at the behest of the Justice Department, in a letter from petitioners' attorneys to the U.S. attorney, the offer of July 1 was supplemented to include certain provisions covering collateral security for the amount offered, which read in part as follows:

This is to advise you that upon acceptance of the offer in question, Grossman and Sons, Inc. agrees to give a cognovit note to the government which will authorize the entering of a judgment in favor of the government in the amount of the damages alleged to have been sustained by the government, to-wit: Two hundred thirty-three thousand one hundred ninety-nine dollars and thirty-four cents ($233,199.34), as liquidated damages, should there be any default in the payment of the eighty thousand dollars ($80,000.00) as described in the offer in question. The note referred to will be the obligation of Grossman and Sons, Inc. as corporate maker, but will be personally guaranteed by Ben Grossman, Arnold Grossman, Marvin Grossman and Herbert Grossman, as officers and directors, who shall sign as accommodation makers. The note shall be held in escrow by the United States Attorney for this District and shall be returned to Grossman and Sons, Inc., upon the payment of the last installment of the eighty thousand dollars ($80,000.00) referred to in the aforesaid offer.

Very truly yours,

Again at the behest of the Justice Department, by letter of December 2, 1958, the offer of settlement contained in the letters of July 1 and July 2, 1958, was modified to provide that the $80,000 balance would be paid over a period of 5 years instead of 8 years as originally proposed.

By letter of December 19, 1958, from the Assistant Attorney General to petitioners' attorneys the offer in settlement that was contained in the letters of July 1 and July 2, 1958, modified by the letter of December 2, 1958, was accepted, as follows:

GENTLEMEN:

Please be advised that the Attorney General has accepted the offer in settlement you have proposed on behalf of your clients, as contained in your letters of July 1, 1958 and July 2, 1958, modified by your letter of December 2, 1958.

We have furthermore decided to effect the mechanics of the settlement in this Department and will escrow the cognovit note here. Upon receipt of the pertinent release executed by Rose Wiping Cloths, Inc., and Grossman & Sons, Inc., pertaining to the Court of Claims action, a properly executed cognovit note prepared in conformity with your letter of July 2, 1958, and $2,974.00, we will instruct the United States Attorney to dismiss the instant action with prejudice in the United States District Court and will execute with you an entry of dismissal of claim and counterclaim in the Court of Claims. Upon payment of the final in-

stallment the cognovit note shall become null and void and of no effect and will be surrendered to you simultaneously with the payment of the final installment.

In order to render conclusive the validity of the cognovit note and release, we shall require a certified copy of the action of the Board of Directors of Grossman & Sons and Rose Wiping Cloths, Inc., authorizing such action as is taken by its officers and a certified copy of the corporations' by-laws or articles of incorporation which permits the Boards of Directors to take such action.

Very truly yours,

In conjunction with the offer in settlement and to provide the security referred to in the settlement letter of July 2, 1958, Grossman, Inc., executed on February 2, 1959, a conditional cognovit note payable to the order of the Treasurer of the United States in the amount of $226,622.56 (after certain credits) which provided that the note was given only as collateral security for payment of the $80,000 balance due under the offer in compromise of the pending District Court suit and should be effective and payable only in the event of default of payment of any of the installments when due.

In compliance with the terms of the settlement agreement, on March 4, 1959, the District Court dismissed the civil case with prejudice and the proviso that no costs or attorneys' docket fees were to be paid.

Thereafter, as a result of this settlement, the Navy issued a public voucher to Grossman, Inc., in the amount of $10,449.92 in payment for wiping cloths furnished by Grossman, Inc., on October 28, 1953, and November 6, 1953, under a specified contract, wherein it was stated as follows:

This action is taken to liquidate the indebtedness of $3,921.68, representing excess profits realized for the fiscal year ended August 31, 1951, as determined by the Renegotiation Board, pursuant to Unilateral Order 1N (UO–51–379).

The balance of the sum of $10,449.92, or $6,528.24 is applied to the offer in compromise of $100,000 submitted by Grossman and Sons, Inc. and Rose Wiping Cloths, Inc. and accepted by the Department of Justice in settlement of all claim of the government arising from the furnishing of defective materials under various contracts with the Department of the Navy.

Throughout the years 1956 to 1959, during the pendency of the District Court action, petitioners continued to contract business with the Government and have done so continuously to date.

On its return for the taxable year ended March 31, 1959, Grossman, Inc., deducted or excluded $100,000 from its reported gross sales, which amount represented the amount agreed to be paid the United States in accordance with the aforementioned settlement.

In his notice of deficiency dated December 28, 1964, respondent disallowed the deduction or exclusion of the $100,000 from income in the taxable year ended March 31, 1959, in the following language:

(a) It is determined that sales returns and allowances of $100,602.03 reported on your income tax return for the taxable year ended March 31, 1959, are over-

stated by the amount of $100,000.00 which was incurred or paid by you in satisfaction of damage claims of the United States under the Federal False Claims Act; this amount is not a proper reduction from gross income nor is it deductible as an ordinary and necessary business expense. Accordingly, your taxable income is increased $100,000.00.

## OPINION

Petitioners entered into contracts with the U.S. Navy Department to supply it wiping cloths of a specified weight and quality. Cloths were shipped to the Navy and petitioners' invoices therefor were paid under the terms of the contracts. Subsequently the United States instituted legal proceedings in a U.S. District Court in Ohio against petitioners and their officers and owners under 31 U.S.C. secs. 231–233,[3] commonly known as the False Claims Act. In that proceeding the United States alleged that the defendants had, by various devices, conspired to defraud the United States by shipping cloths to the Navy which they knew did not meet the specifications in the contracts but at the same time requesting and receiving full payment therefor. The complaint and amended complaint alleged that the United States had been damaged in the amount of $233,199.34 and demanded judgment against the defendants for double the damages sustained, plus the sum of $2,000 for each false claim made by defendants against the United States, all "as provided for in Sections 3490 and 5438 of the Revised Statutes." Inasmuch as petitioners had submitted approximately 100 vouchers for payment under these contracts the total amount claimed by the United States in this proceeding was in excess of $650,000. After protracted negotiations between the representatives of the United States and the defendants, the proceeding was compromised and settled in 1959 by Grossman, Inc., agreeing to pay the United States $100,000. This sum was to be paid by applying toward payment of the settlement figure the sums of approximately $10,000 claimed by each of Grossman, Inc., and Rose, Inc., against the Government in suits under these contracts pending in the U.S. Court of Claims, offsetting this by the amount of approximately $4,000 claimed by the Government as excessive profits realized by Rose, Inc., under these contracts in a proceeding pending before the Renegotiation Board, with the

---

[3] So far as pertinent, the False Claims Act provides:

Any person * * * who shall make or cause to be made, or present or cause to be presented, for payment or approval, * * * any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim * * * shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit.

**26**

balance of over $80,000 to be paid by Grossman, Inc., over a period of 5 years. Upon completion of the settlement agreement, all of the pending litigation between the parties was dismissed, as agreed upon.

Petitioner Grossman, Inc., claimed the $100,000 agreed to be paid in settlement of the above proceeding as a reduction of its gross sales on its 1959 income tax return, which respondent disallowed. In this proceeding petitioner claims that the $100,000 is either excludable from its gross sales as a sales allowance or return, or is deductible as either an ordinary and necessary business expense under section 162(a) or a loss under section 165 of the Internal Revenue Code of 1954.[4]

Respondent's position is that the amount is not allowable either as a reduction of gross sales or as a deduction under section 162(a) or any other section of the Code because "sound public policy forbids a deduction for amounts paid or incurred in satisfaction of damage claims of the United States under the Federal False Claims Act, whether by judgment or by settlement, and the allowance of such deduction would frustrate sharply defined national policy proscribing the conduct of knowingly presenting false claims to the Government." Although the concept of disallowing deductions on the grounds of public policy has been developed and used most frequently in connection with the deduction of "ordinary and necessary business expenses," see *Sarah Backer et al., Executors,* 1 B.T.A. 214; *Commissioner* v. *Heininger,* 320 U.S. 467; *Lilly* v. *Commissioner,* 343 U.S. 90; *Commissioner* v. *Sullivan,* 356 U.S. 27; and *Coed Records, Inc.,* 47 T.C. 422, among many others, the respondent on brief in this case does not argue the public policy concept in that context, but says that for purposes of this case he is asserting as ground for disallowance of the claimed deduction only that allowance of the deduction would severely frustrate the sharply defined public policy underlying the False Claims Act.[5] We assume it can be *argued* with some validity that even though an expenditure meets all of the requirements for being an ordinary and necessary business expense, in the generally understood meaning of those words, it may still not be deductible simply because to allow the deduction would, per se, frustrate sharply defined public policy of the Federal or of State governments. This would find some support in *Commissioner* v. *Tellier,* 383 U.S. 687, where the Court considered the public policy argument even though the Commissioner

---

[4] All references are to the 1954 Code unless otherwise indicated.

[5] On reply brief respondent says: "although respondent does not concede that the item in question was an ordinary and necessary expense paid or incurred by Grossman, Inc. in connection with its trade or business, nevertheless, except to the extent that a portion of the amount was paid by Rose, Inc., respondent for the purposes of this case is asserting as ground for disallowance of the claimed deduction only that allowance of the deduction would severly [sic] frustrate the sharply defined public policy underlying the Federal False Claims Act."

conceded that the taxpayer's legal expenses were ordinary and necessary within the normal meaning of section 162(a). The difficulty with this approach is that Congress has allowed a deduction for all ordinary and necessary expenses paid or incurred in carrying on any trade or business in section 162(a), and there is nowhere to be found any statutory language limiting or prohibiting the deduction of an expenditure that qualifies under section 162(a) or any other section of the Code simply because to allow it would frustrate a sharply defined public policy. For this reason, we assume, the courts, which launched the public policy concept, have found it necessary in applying the concept to conclude that the allowance of a deduction which would frustrate sharply defined public policy could not be considered "necessary" within the meaning of section 162(a) and its predecessors, see *Commissioner* v. *Heininger, supra; Tank Truck Rentals* v. *Commissioner*, 356 U.S. 30, rather than disallowing the deduction, directly, because it would frustrate public policy to allow it. But the public policy concept, having been judicially launched and nurtured, can, we assume, be either restricted or expanded by the tribunals within whose province it was spawned; at least until Congress acts.

We indulge in the above discussion not only because respondent has limited his argument to the public policy per se concept, but also because petitioner alternately claims the payment here involved either is excludable from gross sales, as reported on its return, or is deductible under either section 162(a) or section 165. If the public policy concept is monogamously wedded to the ordinary and necessary business expense deduction, presumably the payment here involved could be used to decrease taxable income if it can be shown to qualify either as a sales allowance or return or as a loss under section 165. So far as we know the test of "ordinary and necessary" has not been used in determining whether the return of a part of the sales price for goods sold in the ordinary course of business may be used to reduce gross income from sales, nor has it been used as a test in determining whether a loss incurred in a trade or business is deductible under section 165. Cf. *North American Investment Co.*, 24 B.T.A. 419. However, for the reasons hereinafter stated, we find it unnecessary to explore these rather interesting side streets because we find that the specific payment here involved qualifies as a business expense, either excludable from gross sales, see *Atzingen-Whitehouse Dairy, Inc.*, 36 T.C. 173, 181; *Pittsburgh Milk Co.*, 26 T.C. 707, or deductible under section 162(a) or section 165, and that to allow petitioner to deduct it would not severely frustrate any sharply defined public policy of the United States, as that concept has been applied in the more recent cases of the Supreme Court.

Clearly, if an expenditure is to be deducted under section 162(a) it must qualify as an ordinary and necessary business expense within the normal meaning of section 162(a); and this determination may, "in extremely limited circumstances," require consideration of the public policy concept. *Commissioner* v. *Tellier, supra.* If allowance of the deduction would severely frustrate a sharply defined public policy of the sovereign, it may not be found to be "necessary" as required by section 162(a). *Commissioner* v. *Heininger, supra; Tank Truck Rentals* v. *Commissioner, supra.* This requires, initially, a determination of what the payment was or what it was for; that is the critical question in the public policy arena, and each of these cases must turn upon its own facts. *Jerry Rossman Corporation* v. *Commissioner,* 175 F. 2d 711; *Tank Truck Rentals* v. *Commissioner, supra.*

Petitioners argue, with good support in the record, that they very carefully worded their settlement offer so the amount to be paid would represent damages resulting from a purported common law breach of contract, that they were willing to compromise the Government's claims only as an ordinary and necessary expense of conducting their business, that the Attorney General accepted their offer without modification in this respect, and that the terms of the settlement agreement therefore characterized the nature of the payment for tax as well as for other purposes. Petitioners contend that the payment was compensatory or restitutionary, rather than penal, in nature and that there is no sharply defined public policy that would prevent the allowance of a deduction for such a payment in computing taxable income. Respondent, on the other hand, argues that all claims under the False Claims Act have their genesis in fraud practiced against the Government, that all amounts paid in satisfaction of claims of the Government under this Act, whether as a result of a judgment or by settlement, are in effect punishment for injury to the public occasioned by violation of the law, and that to permit a deduction of any such amount for tax purposes would dilute the penalty and frustrate the national policy underlying the Act proscribing the conduct of knowingly presenting false claims to the Government.

On the evidence in this record we must agree with petitioners' characterization of the nature of the payment. In doing so we recognize that the payment was made in settlement of the Government's suit under the False Claims Act. But while the Government chose to proceed under the False Claims Act, this does not necessarily mean that the amount petitioners agreed to pay, although resulting in a dismissal of this suit with prejudice, was payment of a penalty or forfeiture. The amount of the single damages alleged by the Government in its amended complaint was $233,199.34. If the Government's

claim had validity it necessarily involved some element of damages suffered by the Government in paying the contract price for goods which did not meet the contract specifications, and petitioners owed the Government something for breach of contract. Petitioners claim that the amount they agreed to pay represented only the damages suffered by the Government and did not include any forfeitures or double damages. This finds support not only in the settlement offer submitted by petitioners and accepted by the Government but also in the fact that the face amount of the cognovit note required by the Government as security was $233,199.34, the single damages alleged to have been suffered by the Government in its amended complaint.

There is no evidence in the record to indicate that in the settlement negotiations or in the settlement agreement itself the Government was attempting to exact a penal sanction from the defendants. The individual defendants had already been found guilty of a criminal conspiracy to defraud the United States and had been fined and sentenced. Had the United States intended that the payment be penal in nature it could have insisted on so indicating in the settlement agreement. Instead, a duly authorized representative of the Government wrote to counsel for petitioners stating that "the Attorney General has accepted the offer in settlement you have proposed on behalf of your clients, as contained in your letters of July 1, 1958 and July 2, 1958, modified by your letter of December 2, 1958." On the record before us we must conclude that the characterization of the payment as damages for breach of contract contained in petitioners' settlement offer, which was accepted by the Attorney General, must be given effect.

Damages paid for breach of contract entered into in the ordinary course of a taxpayer's business and directly related thereto are normally considered to be a business expense, deductible under either section 162(a) or section 165(a). *Great Island Holding Corporation*, 5 T.C. 150; *Stephen H. Tallman*, 37 B.T.A. 1060. Here, if the payment was made to reimburse the Government for its damages suffered in paying the full contract price for faulty goods, as we have found it to be, it was a necessary expense of petitioners' business in that it was "appropriate and helpful" for the development of the petitioners' business. *Welch* v. *Helvering*, 290 U.S. 111. It is interesting to note that here petitioners apparently continued to do business with the Navy throughout the pendency of the litigation under the False Claims Act and up until the date of the trial in this case. The payment as above characterized was also "ordinary" in that payments made in compromise settlements of lawsuits based on claims arising out of the ordinary conduct of business is a common and accepted

means of disposing of business disputes. *Welch* v. *Helvering*, *supra*. In fact, as said by this Court in *Greene Motor Co.*, 5 T.C. 314, quoting from *United States* v. *Knabe*, 147 Fed. 802:

The law favors compromises and settlement of disputed property and pecuniary rights, as well where the government is a party as where the litigation is solely between private individuals. When propositions of compromise of such disputes are made to the government and accepted by it, the courts will apply the same rules for ascertaining their meaning as govern in construing like contracts between man and man. * * *

As heretofore noted, respondent argues that even if the expenditure here involved was an ordinary and necessary expense incurred by petitioner in connection with its business, the expenditure is not deductible because to allow it would frustrate the sharply defined public policy of the United States underlying the False Claims Act. Whether we accept this argument or not, we must perforce examine the legislative history and judicial interpretation of the False Claims Act, because if deduction of a payment made in settlement of a claim under that Act frustrates a sharply defined public policy, the expenditure might not be considered a "necessary" expense under section 162(a).[6]

The False Claims Act was originally enacted on March 2, 1863, 12 Stat. 696, after sensational testimony before the Congress depicted a sordid picture of how the United States had been generally "robbed" in purchasing the necessities for conducting the Civil War; and Congress was determined to stop this plundering of the public treasury. *United States* v. *McNinch*, 356 U.S. 595. Section 5438 of the Revised Statutes made certain acts to defraud the Government crimes and punishable by fines and imprisonment. Section 3490 of the Revised Statutes made the violation of section 5438 subject to forfeitures and double damages. The criminal provisions of section 5438 are now contained in part in 18 U.S.C. secs. 287, 371, and 1001. The provisions of section 3490 subjecting anyone who defrauds the United States by specified means to forfeitures and double damages is now contained in 31 U.S.C. secs. 231–233, which is known as the False Claims Act. Section 231 makes no reference to the criminal statute but provides its own basis for subjecting a person to the forfeitures and double damages.

While there is disparity between the courts as to the nature of the False Claims Act, some holding that it is penal, see *United States* v. *Bausch & Lomb Optical Co.*, 131 F.2d 545, while others consider it to be compensatory or remedial, see *U.S. ex rel. Marcus* v. *Hess*, 317 U.S. 537, it is clear that it is not criminal in nature. *U.S. ex rel. Marcus* v. *Hess*, *supra*. See also *Rex Trailer Co.* v. *United States*, 350 U.S. 148,

---

[6] In the light of our conclusion we need not determine what effect this might have on the deductibility of the expenditure as a loss under sec. 165(a) or as an exclusion from gross sales as a sales return or allowance.

involving the same forfeitures and double damages as provided in the Surplus Property Act.

In the *Hess* case, which involved the question whether a proceeding under the False Claims Act to collect forfeitures and double damages for defrauding the Government from a defendant who had already pleaded nolo contendere to a criminal charge of defrauding the Government was placing the defendant in double jeopardy, the Supreme Court, in holding that it did not, emphasized the distinction between civil, remedial actions brought primarily to protect the Government from financial loss, and action seeking to impose criminal punishment to vindicate public justice. The Court concluded that the proceeding under the False Claims Act was remedial and imposed a civil sanction. It said:

We think the chief purpose of the statutes here was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole. [7] [317 U.S. at 551–552.]

It thus seems clear that the False Claims Act is at least partly remedial and compensatory in nature, although it may also be in part punitive. This history of the False Claims Act does not, in our opinion, support respondent's argument that *no* amounts paid or incurred in satisfaction of claims of the United States under the False Claims Act, whether by judgment or by settlement, are deductible because of public policy. We reject that argument. However, neither are we deciding that *all* amounts paid in satisfaction of such claims are deductible. We are only deciding that the particular payment here involved is deductible and that allowance of the deduction will not severely or immediately frustrate a sharply defined national policy evidenced by a governmental declaration thereof. *Commissioner* v. *Tellier, supra.*

Respondent relies on our decision in *David R. Faulk*, 26 T.C. 948, decided by this Court in 1956, as authority for his claim that no amounts paid in satisfaction of a claim made by the Government under the False Claims Act are deductible. While the principles involved in that case are very similar to the principles involved here, that case can be distinguished from this case in that there the suit brought by the Government under the False Claims Act had been prosecuted to its conclusion and a jury had determined the amount of the double damages and forfeitures owing by the taxpayer to the Government, while here the payment was characterized in the settlement offer which was accepted by the Government as damages for breach of contract. However, in addition, we feel that our position in the *Faulk* case must be reexamined in the light of the four or five cases decided by the Supreme Court since our decision in the *Faulk* case,

---

[7] The False Claims Act provides that the action may be brought by an informer and at times the informer has been entitled to receive up to one-half of the amount recovered.

which we believe tend to limit rather than expand the public policy concept [8] and point up the fact that the lower courts appear to have been more prone in the past to rely on the public policy concept to disallow deductions than the Supreme Court.[9]

In the most recent of the Supreme Court cases, *Commissioner* v. *Tellier*, *supra*, which allowed the deduction of legal fees incurred in the unsuccessful defense of a criminal charge, the Supreme Court started with the proposition that "the federal income tax is a tax on net income, not a sanction against wrongdoing," and that while deduction of expenses falling within the general definition of section 162(a) may be disallowed by specific legislation and at times because of long-standing Treasury Regulation, nevertheless—

where Congress has been wholly silent, it is only in extremely limited circumstances that the Court has countenanced exceptions to the general principle reflected in the *Sullivan*, *Lilly* and *Heininger* decisions. Only where the allowance of a deduction would "frustrate sharply defined national or state policies proscribing particular types of conduct" have we upheld its disallowance. *Commissioner* v. *Heininger*, 320 U.S., at 473. Further, the "policies frustrated must be national or state policies evidenced by some *governmental* declaration of them." *Lilly* v. *Commissioner*, 343 U.S., at 97. (Emphasis added.) Finally, the "test of nondeductibility always is the severity and immediacy of the frustration resulting from allowance of the deduction." *Tank Truck Rentals* v. *Commissioner*, 356 U.S. 30, 35. In that case * * * we upheld the disallowance of deductions claimed by taxpayers for fines and penalties imposed upon them for violating state penal stautes; to allow a deduction in those circumstances would have directly and substantially diluted the actual punishment imposed.

*        *        *        *        *        *        *

Congress has authorized the imposition of severe punishment upon those found guilty of the serious criminal offenses with which the respondent was charged and of which he was convicted. But we can find no warrant for attaching to that punishment an additional financial burden that Congress has neither expressly nor implicitly directed. * * *

In *Tank Truck Rentals* v. *Commissioner*, *supra*, and in *Hoover Express Co.* v. *United States*, 356 U.S. 38, the Supreme Court disallowed the deduction of fines, or penalties, directly imposed by State statutes for violation of its laws, whether the violations were willful or by innocent mistake, on the ground that to allow the deduction would frustrate the clearly stated public policy of the State by diluting the

---

[8] Our disallowance of legal fees in *David R. Faulk*, 26 T.C. 948, would be of doubtful validity now in view of *Commissioner* v. *Tellier*, 383 U.S. 687. Respondent has also conceded the deductibility of legal fees in this case and has recently changed his position on this issue as a result of *Tellier*. See Rev. Rul. 66–330, 1966–2 C.B. 44, modifying Rev. Rul. 64–224, 1964–2 C.B. 52, in this respect.

[9] In *Tellier*, the Supreme Court said (p. 690) : "The Commissioner and the Tax Court determined, however, that even though the expenditures meet the literal requirements of § 162(a), their deduction must nevertheless be disallowed on the ground of public policy. That view finds considerable support in other administrative and judicial decisions.[9] It finds no support, however, in any regulation or statute or in any decision of this Court, * * *." (Fn. omitted.)

penalties for the statutory wrongdoing. But in *Commissioner* v. *Sullivan, supra*, the Court allowed deduction of rent paid for premises used, and salaries paid to employees, in conducting an illegal business, although, as said by the Supreme Court in its opinion—

The Tax Court found that these enterprises were illegal under Illinois law,[2] that the acts performed by the employees constituted violations of that law, and that the payment of rent for the use of the premises for the purpose of bookmaking was also illegal under that law. * * * [Fn. omitted.]

In the first two cases the fines themselves were involved; in the third case the penalty imposed by the statute for doing the proscribed act was not involved—rather the expenses of conducting a business such as the one involved, which would undoubtedly be considered ordinary and necessary if the business itself were not illegal, were involved. In the *Tellier* case the expenditures involved were likewise not the fines and penalties imposed for violation of the law, but were legal fees paid in defending the criminal charge, which would normally be deductible if business connected. See also *Commissioner* v. *Heininger, supra.* It would thus seem that the Supreme Court will disallow deduction of the fines and penalties specifically imposed for violation of a law on the grounds of public policy, but will not disallow the ordinary and necessary expenses of conducting a business just because the business is illegal or immoral. On the other hand the Court has also disallowed deduction of expenditures which are themselves prohibited by Federal law or by long-standing Treasury regulations, such as expenditures for "lobbying," or the promotion or defeat of legislation. See *Textile Mills Corp.* v. *Commissioner*, 314 U.S. 326; *Cammarano* v. *United States*, 358 U.S. 498. See also *Coed Records, Inc., supra*, in which this Court disallowed deduction of "payola" paid by a record company to disc jockeys because the payments themselves were found to violate State law and to allow them as a deduction would frustrate the public policy of the State. But unless the expenditure involved has been either a penalty imposed by law or a payment prohibited by statute or longstanding regulations (which are considered to have congressional approval) the Supreme Court has been reluctant to deny ordinary and necessary business expenses on the grounds of public policy because to do so would be limiting deductions specifically granted by Congress and using the tax laws to punish illegal and immoral conduct.

In the light of these subsequent pronouncements of the Supreme Court on the public policy issue, we believe we may have gone too far in our opinion in *David R. Faulk, supra*. Insofar as anything said by this Court in its opinion in the *Faulk* case is inconsistent with this opinion, we will not hereafter be guided by the *Faulk* opinion. This

case is distinguishable from *Coed Records, Inc., supra,* where we found that the payments sought to be deducted were prohibited by State law.

We hasten to add, however, that we do not believe Grossman, Inc., is entitled to deduct that portion of the agreed settlement figure which was satisfied by application of the amount due Rose, Inc., by the Government in its Court of Claims case. This was $10,498.46. Offsetting this, however, was the amount of $3,921.68 due the Government by Rose, Inc., under an order of the Renegotiation Board. This would reduce the amount paid on the settlement figure by Rose, Inc., to $6,576.78. The balance of the amount agreed to be paid by Grossman, Inc., is deductible by it.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

BRUCE, *J.*, dissenting: I do not agree with the opinion of the majority allowing the petitioners a deduction for the $100,000 paid by them in settlement of the civil action brought against them by the United States under 31 U.S.C. secs. 231–233, sometimes called the False Claims statute. In my opinion the allowance of such deduction clearly frustrates the national policy of the United States, which is sharply defined by the False Claims statute.

Section 231 is a codification of and refers to sections 5438 and 3490 of the Revised Statutes. These sections, now distributed through the statutes, are parts of what was originally the Act of March 2, 1863, 12 Stat. 696. Section 5438, standing alone, is a criminal statute, the first three clauses of which proscribe three distinct offenses relating to the making or presenting of false, fictitious, or fraudulent claims upon or against the United States, or conspiring to obtain the payment or allowance of any false or fraudulent claim. Section 3490 provides that any person who shall do or commit "any of the acts prohibited by any of the provisions" of section 5438 shall "forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act * * * and such forfeiture and damages shall be sued for in the same suit." This is a civil remedy and the device for specific sums plus double damages was intended to make sure that the Government would be made "completely whole." *United States ex rel Marcus* v. *Hess,* 317 U.S. 537, 549, 551–552; *United States* v. *Rohleder,* 157 F. 2d 126; *United States* v. *Grannis,* 172 F. 2d 507, certiorari denied 337 U.S. 918. These provisions considered together, as they must be, indicate a purpose to reach any person, criminally and civilly, who knowingly caused or assisted in causing the Government to pay claims which were grounded in fraud.

To allow such person a tax deduction for the amount paid as the result of such actions would, in my opinion, clearly frustrate the national policy demonstrated by these statutes. *Commissioner* v. *Tellier*, 383 U.S. 687, is distinguishable and, in my opinion, does not require a different conclusion. The *Tellier* case dealt with the question of the deductibility of legal fees or expenses incurred in connection with the defense of a criminal action. In the present case the Commissioner has conceded the deductibility of legal expenses. Except as to the issue relating to the deductibility of legal fees, the case of *David R. Faulk*, 26 T.C. 948, was, in my opinion, correctly decided and should be followed.

I might add that, in my opinion, the petitioners' characterization of the payment as damages for breach of contract did not change the nature of the controversy being settled. In fact, as the offer in compromise states, the Government claimed and continued to claim that the petitioners had not complied, in all respects, with the specifications and warranties contained in the Navy contracts. The Government's cause of action was grounded in fraud, and the payment by petitioners was in satisfaction of the Government's claim—a sanction clearly spelled out in a statute of the United States. The allowance of the deduction would dilute the effect of that sanction. This case is thus closer to *Tank Truck Rentals* v. *Commissioner*, 356 U.S. 30, than it is to *Tellier*, and I would follow the path indicated by it.

I respectfully dissent from the opinion of the majority.

RAUM, PIERCE, DAWSON, *JJ.*, agree with this dissent.

———

DAWSON, *J.*, dissenting: I agree with the dissenting opinion of Judge Bruce and with the Commissioner's position that the allowance of the deduction claimed by Grossman, Inc., would frustrate the sharply defined public policy underlying the Federal False Claims Act. I shed no crocodile tears for any corporation which knowingly defrauds the United States Government. While defective "wiping cloths" might be relatively innocuous, the next time it could be parachute silk, ammunition, or anti-ballistic missiles vital to our national defense. Unlike the majority, I would not confer a Federal income tax deduction on "damages," however characterized, flowing from a fraudulent and flagrant violation of the False Claims Act. In construing the "ordinary and necessary" language of the business expense deduction, the Supreme Court said in *Tank Truck Rentals* v. *Commissioner*, 356 U.S. at 33–34:

A finding of "necessity" cannot be made, however, if allowance of the deduction would frustrate sharply defined national or state policies proscribing particular types of conduct, evidenced by some governmental declaration thereof. * * *

To allow a deduction under these circumstances would frustrate national policy in a severe and direct fashion by reducing the "sting" of the sanction provided by Congress. Therefore, I am unable to make in this case the finding of "necessity" which the *Tank Truck* case requires.

RAUM, *J.*, agrees with this dissent.