FISHER COMPANIES, INC., PETITIONER V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16064–83.     Filed June 24, 1985.

*George T. Cowan,* for the petitioner.
*Henry Thomas Schafer,* for the respondent.

OPINION

Scott, *Judge*: Respondent determined deficiencies in petitioner's income tax for the calendar years 1977 and 1979 in the respective amounts of $119,234 and $222,856. The issues for decision are: (1) Whether the two-thirds disallowance provision in section 162(g)[1] applies to limit the deduction of payments made in 1977 by Fisher Mills, Inc., a subsidiary of petitioner, to American Bakeries Co. in the amount of $432,791.80 and to Interstate Brands Corp. in the amount of $121,500 to settle an action brought under section 4 of the Clayton Act after petitioner's nolo contendere plea was accepted in a prior criminal proceeding involving violation of the Sherman Act where an injunction was neither sought nor obtained and, if such limitation applies, the amount of the disallowance; (2) whether the two-thirds disallowance provision in section 162(g) applies to limit the deduction of a payment made in the amount of $144,039.27 in 1977 by Fisher Mills, Inc., to ITT Continental Baking Co. prior to institution of a civil action under section 4 of the Clayton Act; and (3) whether the purchase price Societe Candy Co. received from the sale of its assets to Golden Grain Macaroni Co. included $500,000 for Golden Grain Macaroni Co.'s assumption of Societe Candy Co.'s leasehold obligation to repair the roof of the leased premises.

All of the facts have been stipulated and are found accordingly.

Petitioner is a corporation duly organized under the laws of the State of Washington. At the time of filing its petition in this case, petitioner maintained its principal place of business in Seattle, Washington. Petitioner filed its corporate Federal income tax returns for taxable years 1977 and 1979 with the Internal Revenue Service Center, Ogden, Utah. Petitioner filed an amended 1977 corporate Federal income tax return on October 15, 1980.

Petitioner filed its 1977 and 1979 Federal income tax returns on a consolidated basis with the following companies for the stated years:

---

[1]Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years here in issue.

| Company | Years |
|---|---|
| Fisher Properties, Inc | 1977 and 1979 |
| Trotwood, Inc | 1979 |
| Fisher Mills, Inc | 1977 and 1979 |
| Murphy Feed Co | 1977 and 1979 |
| Napavine Feed Co | 1977 |
| Valley Milling Co | 1977 and 1979 |
| Sam Wylde Flour Co | 1977 and 1979 |
| Fisher Broadcasting, Inc. (formerly Fisher's Blend Station, Inc.) | 1977 and 1979 |
| Fisher Services, Inc. (formerly Societe Candy Co.) | 1977 and 1979 |
| Imperial Candy Co | 1977 and 1979 |
| Technovators, Inc | 1977 and 1979 |
| Fisher's CSI, Inc | 1977 |

On August 15, 1972, a grand jury for the United States District Court for the District of Colorado returned a one-count indictment against the following named defendants:

1. Colorado Milling & Elevator Co.
2. Fisher Mills, Inc.
3. California Milling Corp.
4. VWR United Corp. (a.k.a. Univar Corp.)
5. J. Lawson Cook
6. Kenneth R. Fisher
7. Dugald A. MacGregor

At the time of the indictment, Colorado Milling & Elevator Co. was a wholly owned subsidiary of Peavey Co.; Fisher Mills, Inc., was a wholly owned subsidiary of petitioner, Fisher Co.'s, Inc. (formerly known as Fisher Flouring Mills Co.).

The indictment charged conspiracy in restraint of interstate trade and commerce in violation of 15 U.S.C. sec. 1 (1975), commonly known as the Sherman Antitrust Act. The indictment charged that the violation consisted of illegal acts and conduct of the defendants during the period "beginning sometime prior to 1963, the exact date being to the Grand Jurors unknown, and continuing thereafter up to at least 1969."

On March 16, 1973, in the U.S. District Court for the Western District of Washington, Fisher Mills, Inc. (Fisher Mills) was adjudged guilty upon its plea of nolo contendere of violating section 1 of the Sherman Antitrust Act by engaging in a conspiracy during the period August 15, 1967, through

December 31, 1969, to raise, fix, and stabilize the price of bakery flour sold to commercial bakeries located in the western United States and was ordered to pay a fine to the United States in the amount of $10,000. The United States neither sought nor obtained an injunction against Fisher Mills or any of the other defendants.

On March 15, 1974, American Bakeries Co. (American Bakeries) commenced a civil action in the U.S. District Court for the Western District of Washington against the following defendants alleging violations of sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. secs. 1, 2 (1975)), sections 13 and 13(a) of the Robinson-Patman Act (15 U.S.C. secs. 13, 13(a) (1975)), and seeking damages and injunctive relief pursuant to sections 4 and 16 of the Clayton Act (15 U.S.C. secs. 15, 26 (1975)):

1. Fisher Companies, Inc.
2. Fisher Mills, Inc.
3. VWR United Corp. (a.k.a. Univar Corp.)
4. Colorado Milling & Elevator Co.
5. Great Western United Corp.
6. Peavey Co.
7. California Milling Corp.
8. Conagra-Montana, Inc.
9. Terminal Flour Mills Co.
10. General Foods Corp.
11. Conagra, Inc.

American Bakeries' amended complaint alleged an unlawful conspiracy "commencing at sometime prior to 1955, the exact date being unknown to plaintiff, and continuing up to and including the date of the filling of this amended complaint" (March 15, 1974).

On January 27, 1976, Interstate Brands Corp. (Interstate) commenced a civil action in the U.S. District Court for the Northern District of California against the following defendants alleging violations of sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. secs. 1, 2 (1975)), and seeking damages and injunctive relief pursuant to section 4 and 16 of the Clayton Act (15 U.S.C. secs. 15, 26 (1975)):

1. Fisher Mills, Inc.
2. VWR United Corp. (a.k.a. Univar Corp.)
3. Colorado Milling & Elevator Co.

4. Peavey Co.
5. California Milling Corp.
6. Conagra, Inc.
7. Conagra-Montana, Inc.

Interstate's complaint alleged an unlawful conspiracy "commencing at sometime prior to 1955, the exact date being unknown to plaintiff, and continuing up to and including the date of the filing of this complaint" (January 27, 1976).

Procedurally, the civil actions commenced by American Bakeries and Interstate were consolidated sub nom. In re West Coast Bakery Flour Antitrust Litigation.

On June 1, 1977, the U.S. District Court entered an order against American Bakeries granting:

(1) Defendant's motion for partial summary judgment to dismiss claims accruing prior to August 15, 1968;

(2) Defendant's motion to strike all claims based on the Robinson-Patman Act prior to 1972; and

(3) Defendant's motion to strike all claims by American Bakeries for damages based on what defendants describe as "prejudgment interest," subject to renewal if and when liability and impact be established.

After this action, settlement discussions continued. In a letter dated June 7, 1977, to the attorney for Fisher Mills and other defendants, the attorney for American Bakeries stated in part:

> You have referred to certain of the Court's rulings last Wednesday to support your settlement offer in behalf of all remaining defendants. First, while the "prejudgment interest" motion was granted, it was granted subject to renewal by American at trial once liability and impact are established.
>
>     *     *     *     *     *     *     *
>
> Thirdly, we believe that the Santa Fe rate issue and the issue of fraudulent concealment constitute reversible error and we will be filing motions for reconsideration on both of these issues, as well as alternative requests for certification. The ruling on the Santa Fe issue does not directly affect either the amount or the basis of the damages incurred by American. The freight rate conspiracy, while certainly, we believe, a violation of the Sherman Act, is not nor has it ever been a separate basis for liability but is rather further evidence of the defendants' and co-conspirators' price-fixing activities and the method by which the defendants and co-conspirators effectively excluded competition from the Midwest.
>
> While the fradulent concealment issue has a direct effect on the damages suffered by American, we are convinced that it was wrong for the Court to

grant summary judgment on this issue, that a clear jury question is presented and that the decision will be reversed either by this Court or by the Court of Appeals. If American's motions for reconsideration are denied, and failing a prompt settlement, American will try the case as now framed, and retry the fraudulent concealment and additional damage issues at a second trial.

The American Bakeries litigation was settled on June 28, 1977, the day the trial was to commence, and defendants paid American Bakeries a total of $2,844,996 as follows:

| Defendant | Amount |
|---|---|
| Fisher Co., Inc., and subsidiary Fisher Mills, Inc | $432,791.80 |
| VWR United Corp. (a.k.a. Univar Corp.) | 432,791.80 |
| Colorado Milling & Elevator Co. (CM & E) | 534,256.80 |
| Great Western United Corp | 0 |
| Peavey Co | 50,000.00 |
| California Milling Corp | 219,996.00 |
| Conagra-Montana, Inc., and Conagra, Inc | 700,000.00 |
| Terminal Flour Co | 50,000.00 |
| General Foods Corp | 425,000.00 |
| Unexplained difference | 159.60 |
| Total | 2,844,996.00 |

On June 29, 1977, the attorney for American Bakeries addressed a letter to the attorney for Fisher Mills and petitioner. The letter stated in part:

This is to confirm our understanding that I will notify you on or before August 15, 1977, of the total fees and expenses of the plaintiff in the above action so that the settling defendants in this action can apply a portion of the settlement as a tax deduction.

American Bakeries agrees to this procedure and will cooperate in substantiating an appropriate tax deduction for the settling defendants.

Fisher Mills' settlement with American Bakeries provided that all amounts paid would first reimburse the plaintiff for costs of suit and attorneys' fees and that the remainder of the settlement amount would be attributable to plaintiffs' damages. In a letter dated October 10, 1977, to the attorney for the defendants, Fisher Mills, Inc., Univar Corp., Peavey Co. on behalf of CM & E, Peavey Co., individually, and Terminal Flour Mills, Inc., the lawyer for American Bakeries stated as follows:

This will confirm our understanding of June 28, 1977, had prior to and as a condition of settlement of the above referred to litigation.

It was agreed that plaintiff, American Bakeries Company, would apply the settlement amounts paid by the defendants, Fisher Mills, Inc., Univar Corporation, and Peavey Company on behalf of CM & E, ($1,400,000), The Peavey Company ($50,000) and Terminal Flour Mills Co. ($50,000) on a prorata basis as follows:

All amounts paid would first reimburse the plaintiff (American Bakeries Company) for costs of suit and attorneys' fees. It was agreed the remainder of the settlement amount, if any, would be attributed to plaintiff's damages.

The plaintiff's (American Bakeries Company) costs of suit and attorneys' fees paid in this action were $1,847,990.50. A settlement was made by plaintiff with defendant California Milling Corporation prior to June 28, 1977. It was agreed between the plaintiff and California Milling Corporation that the entire amount of their settlement ($219,996) would be applied toward plaintiff's costs and attorneys' fees. Consequently, plaintiff American Bakeries Company had paid $1,627,994.50 in costs and attorneys' fees for which it had not been reimbursed by any defendant.

Pursuant to our agreement of settlement, the entire $1,500,000 paid by the defendants, Fisher Mills, Inc., Univar Corporation, and Peavey Company on behalf of CM & E, The Peavey Company, individually, and Terminal Flour Mills, Inc., has been applied by plaintiff American Bakeries Company as reimbursement for its costs of suit and attorneys' fees.

On January 30, 1974, Fisher Mills, California Milling Corp., Colorado Milling & Elevator Co., and VWR United Corp. (Univar Corp.) entered into an agreement that apportioned the cost to be shared by the parties if a judgment was entered against them. On October 10, 1974, Peavey Co. became a party to this agreement and subsequent agreements that would be entered into by the four parties. The parties also entered into a "Memorandum of Agreement Cost Sharing" dated January 30, 1974, which provided for the sharing of certain common expenses incurred in connection with the litigation. On October 10, 1974, the businesses of Peavey Co. and Colorado Milling & Elevator Co. were combined, and Peavey Co. assumed the position of Colorado Milling & Elevator Co. in the litigation.

The parties agreed to share all costs and expenses incurred as follows:

| Company | Percentage |
|---|---|
| California Milling Corp | 23⅓ |
| Colorado Milling & Elevator Co.[2] | 30 |

[2]The parties agreed in a substitution agreement to substitute Peavey Co. for Colorado Milling & Elevator Co. as a party to the agreement.

| Company | Percentage |
|---|---|
| Fisher Mills, Inc | 23⅓ |
| VWR United Corp | 23⅓ |

Petitioner and its counsel had full knowledge of all relevant authorities concerning the Federal income tax consequences of antitrust litigation settlement payments, and at the time petitioner entered into the settlement agreement with American Bakeries, petitioner believed the full amounts of such payments would be deductible for Federal income tax purposes.

Pursuant to the settlement agreement, petitioner and Fisher Mills paid $432,791.80 to American Bakeries on or about June 30, 1977. Petitioner included this entire amount in its deductions on its 1977 consolidated Federal income tax return as "Professional Fees and Settlements—$1,313,252."

On July 1, 1977, on the motion of American Bakeries, the U.S. District Court for the Western District of Washington dismissed with prejudice and without costs the American Bakeries' suit against defendant Fisher Co.'s, Inc., on the ground that no evidence had been produced which would in any way substantiate the allegations of American Bakeries as to the alleged activities of Fisher Co.'s, Inc.

On July 1, 1977, pursuant to a joint Stipulation and Order for Dismissal, American Bakeries dismissed with prejudice its complaints against each of the following defendants with each party to bear its own costs:

    (a)  Fisher Mills, Inc.
    (b)  Colorado Milling & Elevator Co.
    (c)  Univar Corp.
    (d)  Terminal Flour Mills Co.
    (e)  Great Western United Corp.

Each of the aforementioned defendants also dismissed with prejudice their counterclaims against American Bakeries.

The release document executed on July 1, 1977, between American Bakeries and Fisher Co.'s Inc., and American Bakeries and Fisher Mills, respectively, each specifically provided as follows:

each of the undersigned hereby releases and forever discharges each other (the "Releasee") * * * from any and all manner of action or actions, cause or causes of action, in law or in equity, including claims under the federal or

state antitrust laws * * *, of any nature whatsoever known or unknown, fixed or contingent (hereinafter called "Claims"), which the respective undersigned now has or may hereafter have against the Releasee by reason of any matter, cause, or thing whatsoever from the beginning of time to the date hereof including, without limiting the generality of the foregoing, any Claims arising out of, based upon, or relating to that certain suit now pending in the Federal District Court for the Western District of Washington entitled *American Bakeries Company v. Fisher Companies, Inc.*, No. 185–732C2, including any cases filed by American Bakeries in any other Districts consolidated with this action, as well as any matters, causes or things whatsoever that were or have been, or could in any way have been, alleged in the respective pleadings filed in said suit (but excepting any contractual rights either party has as to the other under any existing contract).

On March 8, 1977, the defendants, Fisher Mills, Inc., et al., in the Interstate litigation filed a motion for partial summary judgment in the U.S. District Court for the Western District of Washington. On May 18, 1977, the District Court entered an order granting defendants' motion for partial summary judgment and dismissing damage claims which accrued prior to January 27, 1972.

The Interstate litigation was settled on December 30, 1977, when defendants paid a total of $500,000 to Interstate as follows:

| *Defendant* | *Amount* |
| --- | --- |
| Fisher Mills, Inc | $121,500.00 |
| VWR United Corp | 121,500.00 |
| Colorado Milling & Elevator Co. and Peavey Co | 149,999.85 |
| California Milling Corp | 57,000.15 |
| Conagra, Inc. and Conagra-Montana, Inc | 50,000.00 |
| Total | 500,000.00 |

Pursuant to the settlement agreement, Fisher Mills paid $121,500 to Interstate on or about December 31, 1977, and this entire amount was included in petitioner's deductions on its 1977 consolidated Federal income tax return as "Professional Fees and Settlements—$1,313,252.00." The settlement agreement provided that all payments by the defendants first be applied to reimbursement of Interstate's attorneys' fees and costs of suit, with the remainder, if any, to be attributed to plaintiff's damages. In an undated letter to the attorney for Fisher Mills and the other defendants, the attorney for Interstate stated in part as follows:

This will confirm that, as a condition and term of the settlement, we agreed as follows:

1. Interstate Brands Corporation shall apply the $500,000 payment made by Defendants in full settlement of the above-entitled action as follows: The proceeds shall first reimburse Plaintiff (Interstate Brands Corporation) for costs of suit and attorneys' fees, and the remainder of the settlement proceeds, if any, shall be attributed to Plaintiff's claims for damages for the period subsequent to January 27, 1972, as established by the Order of the Honorable George H. Boldt dated May 18, 1977.

A letter dated December 30, 1977, addressed to the attorney for Interstate by the attorney for Fisher Mills and the other defendants stated in part as follows:

As I indicated to you in our earlier telephone conversation, the Defendants in the Interstate case are prepared to pay your client $500,000 cash and dismiss with prejudice their counterclaim in exchange for:

\*        \*        \*        \*        \*        \*        \*

c. Confirmation from you that Interstate Brands Corporation will apply the $500,000 payment in accordance with the letter herewith enclosed and provide the requested tax information; * * *

Petitioner and its counsel had full knowledge of all relevant authorities concerning the Federal income tax consequences of antitrust litigation settlement payments, and at the time petitioner entered into the settlement agreements with Interstate, petitioner believed the full amounts of such payments would be deductible for Federal income tax purposes.

In a letter dated January 9, 1978, addressed to the attorney for Fisher Mills and other defendants, the attorney for Interstate stated in part: "Upon receipt of the settlement monies I shall as promptly as possible arrange for all the documents to be returned and shall provide you with the required tax information."

On January 30, 1978, Fisher Mills was informed that Interstate incurred and paid $180,000 for litigation costs and attorneys' fees with respect to the civil litigation brought against petitioner and other defendants.

The release document executed on January 6, 1978, between Interstate and Fisher Mills specifically provided as follows:

each of the undersigned hereby releases and forever discharges each other (the "Releasee") * * * from any and all manner of action or actions, cause or causes of action, in law or in equity, including claims under the federal or

state antitrust laws * * * of any nature whatsoever known or unknown, fixed or contingent (hereinafter called "Claims"), which the respective undersigned now has or may hereafter have against the Releasee by reason of any matter, cause or thing whatsoever from the beginning of time to the date hereof including, without limiting the generality of the foregoing, any Claims arising out of, based upon, or relating to that certain suit consolidated in *In Re West Coast Bakery Flour Antitrust Litigation* (M.D.L. Docket No. 146) in the Federal District Court for the Western District of Washington, entitled *Interstate Brands Corporation v. Fisher Mills, Inc., et al.,* C76 189SAW (N.D. Cal.), as well as any matters, causes or things whatsoever that were or have been, or could in any way have been, alleged in the respective pleadings filed in said suit (but excepting any contractual rights either party has as to the other under any existing contract).

ITT Continental Baking Co. (ITT), a major national baker, believed it had claims against Fisher Mills and other defendants similar to the claims asserted in the case brought by American Bakeries against Fisher Mills.

On March 4, 1974, an agreement was reached between ITT and California Milling Corp., Colorado Milling & Elevator Co., Fisher Co.'s, VWR United Corp., and Fisher Mills (the millers). The parties agreed to settle without litigation, claims which ITT believed it could assert against such millers, and defenses, counterclaims, and offsets which such millers would assert against ITT. The ITT agreement provided that such millers would pay to ITT 35.4 percent of the single damage liability to American Bakeries established by final judgment, or 35.4 percent of any settlement payment to American Bakeries before judgment. ITT did not commence an action or suit against the millers.

Pursuant to the ITT agreement, the millers paid $573,478.76 (before technical adjustments) to ITT in settlement as follows:

| Defendant | Amount |
|---|---|
| Colorado Milling & Elevator Co | $191,157.67 |
| Fisher Mills, Inc | 154,839.27 |
| Univar Corp | 154,839.27 |
| California Milling Corp | 72,642.55 |
| Total | 573,478.76 |

The settlement payments made by the millers (before adjustments) were 35.4 percent of the amount of their settlement with American Bakeries. After a number of adjustments, the amount of $144,039.27 was paid in 1977 by Fisher Mills to ITT. This amount was included in petitioner's deductions on its

1977 Federal income tax return as "Professional Fees and Settlements—$1,313,252."

The relevant terms of the ITT agreement provided as follows:

1. *Recitations.*

The Millers are involved in a case brought by American Bakeries Company (herein "American") in the Federal Court in the Western District of Washington for the recovery of civil damages for alleged violation of the Sherman Act by the Millers. Continental is a major national baker and believes it could assert similar claims against the Millers and has in fact taken steps toward the commencement of such litigation. The Millers believe that they have valid defenses, counterclaims and offsets against any claims Continental might assert.

All parties deny that they have violated the antitrust laws or engaged in any other wrongdoing. It is recognized, however, that there are uncertainties and injustices in the trial of antitrust matters including the possibility of the exaction of treble damages (the existence of which a jury may not be aware), attorneys fees, costs and interest.

It is also recognized that any such litigation involving the parties would be complex, expensive and harmful to all parties. This Agreement is entered into to avoid such litigation by effecting a negotiated, amicable settlement of the claims and counterclaims which Continental and the Millers may have against each other.

2. *Releases.*

Continental and Millers hereby release each other from all claims for any alleged violation of federal or state antitrust laws based upon any act or failure to act which occurred prior to the date of this agreement, whether known or unknown. These releases are intended solely for the benefit of the parties to this agreement, and no party intends the releases contained herein to apply to, or run to the benefit of, any other person, firm, or corporation.

Continental will not, nor will anyone on its behalf nor any assignee, commence any action or suit * * * for any alleged violation(s) of federal or state antitrust laws arising out of the violations alleged in the action entitled *United States v. Colorado Milling & Elevator Company, et al.*, Crim. No. 72 CR 233 (D. Colo. 1972), which, upon transfer to the Western District of Washington, became No. 287–72D2 (W.D. Wash.) (hereinafter "*U.S. v. CM & E*").

3. *Settlement Payment.*

This agreement provides for a settlement payment to Continental by the Millers, jointly and severally, in the event of an adverse final judgment based upon the alleged violation(s) of the Sherman Act in the American case or a settlement of American's Sherman Act claims.

(a) *Amount.*

The amount of the settlement payment to be made to Continental shall be:

(i) in the event of such final judgment in the American case, 35.4 percent of the single damage liability to American established by the final judgment; or

(ii) in the event of settlement with American before the verdict of the jury or decision of the Judge, 35.4 percent of the amount of the settlement with American.

If a settlement of the American case is consummated after the verdict or decision has been announced in the trial court, the amount of the settlement payment to be made to Continental shall be 35.4 percent of the lesser of:

(i) the single damage liability set forth in the verdict or decision; or

(ii) the amount of the settlement with American.

\* \* \* \* \* \* \* '

(c) *Definitions.*

(1) "Final judgment" means a judgment in favor of American entered by the trial court, after trial on the issues of liability and damages which becomes final either after completion of all available proceedings for direct review thereof, or after expiration of the time to obtain initial or further direct review.

(2) "The American case" means the case pending in the United States District Court for the Western District of Washington No. 185–73C2, in which American Bakeries Company is plaintiff and Fisher Companies, Inc., et al., are defendants.

(3) "Single damage liability" means the amount of compensatory damages, only, awarded by the court or a jury as the case may be in the American case and does not include any amount based upon interest, costs, attorneys' fees or the trebling of damages.

(4) "The amount of the settlement with American" means all amounts paid by any Miller to American, no matter in what form nor how described, which are intended to or which in fact do cause dismissal or settlement of the Sherman Act claims in the American case. \* \* \*

On January 1, 1973, Fisher Properties, Inc., as lessor, and Societe Candy Co. (Societe), as lessee, both subsidiaries of petitioner, entered into a 20-year lease of improved commercial real estate in King County, Washington. Societe conducted its business on the premises and was obligated under the lease to pay annual rent of $160,412 for each year during the original lease term which extended from January 1, 1973, to January 1, 1993. The lease provided as follows:

*Maintenance and Repairs.* Lessor shall keep the roof, exterior walls and foundation of the leased premises in as good a state of repair as they presently are and shall accomplish repairs to such portions of the leased premises as may be needed promptly after receipt of written notice from Lessee. Lessor shall not be called upon to make any improvements or other repairs of any kind to or upon the premises. Should Lessor fail to make such repairs within a reasonable time, Lessee may make such repairs and deduct the cost thereof from the rental amount(s) next due. \* \* \* Lessee shall be

responsible for all other repairs and/or maintenance on or about the leased premises * * *

On July 26, 1979, Societe and Fisher Properties, Inc., entered into an amendment of the original lease because Societe wanted to sell certain assets that existed on the property and the purchaser of the assets wanted to assume the lease, provided certain amendments were made. The amendment`increased the monthly lease payments due, imposed upon the lessee the obligation to repair the roof by June 30, 1980, and granted to the lessee an option to purchase the property at any time during the period commencing January 1, 1980, and extending through December 31, 1981, at a price of $3,390,000. The base rent to be paid under the amended lease was $30,400 per month or $364,800 per year during the period beginning August 1, 1979, through December 31, 1984, and during the period from January 1, 1985, to the last day of the lease term, the monthly rent was the greater of $30,400 or the annual fair rental value of the property as determined by three real estate appraisers on December 1, 1984.

Pursuant to the July 26, 1979, lease amendment, Societe became obligated to repair the roof of the leased premises and obtained an option to purchase the improved real estate:

20. *Roof Repair.* Lessee acknowledges that there presently are deficiencies in the roof of the leased premises, and Lessee accepts the leased premises with full knowledge that significant corrective action must be taken in order to put the roof in suitable condition. Lessee agrees to undertake and perform such repairs to the roof as are necessary to place it in a good condition, appropriate to the building and commensurate with its age, such repairs to be completed prior to June 30, 1980. Such repair work may be performed by Lessee as and when it can do so, having in mind the continued efficient operation of the plant, and may be accomplished in the manner and method of Lessee's choice. Lessee accepts and assumes full responsibility for the condition of the roof and will indemnify and hold Lessor harmless from all loss, damage, liability, costs and expenses resulting from or arising out of the condition of the roof.

21. *Option to Purchase Real Property.* Lessor hereby gives and grants to Lessee the exclusive option to purchase the Real Property, together with all the buildings and all other improvements thereon. This option is given on the following terms and conditions:

21.1 The option period shall be January 1, 1980, through December 31, 1981 (hereafter the "Option Period"). Lessee may exercise the option by giving written notice thereof to Lessor at any time during the Option Period. Lessee's option rights shall expire on December 31, 1981.

21.2 The purchase price of the Real Property shall be Three Million Three Hundred Ninety Thousand Dollars ($3,390,000) (hereinafter the "Option Price"). The Option Price shall be paid in full by certified or cashier's check on the closing date.

On July 27, 1979, Societe sold Golden Grain Macaroni Co. (Golden Grain) all of the operating assets of Societe as follows:

1. *Assets to be Sold.* Seller hereby sells to Buyer and Buyer hereby purchases from Seller, the following assets (hereinafter collectively called "the Assets"):

(a) All of the Seller's inventory of raw materials, finished manufactured goods, finished resale goods, finished boxed chocolates, packaging, wrapping, ingredients, chocolate candy, non-chocolate candy, and work in process (the "Inventory");

(b) All of the machinery and equipment, office furniture, and other equipment owned by Societe and used in connection with its candy manufacturing and distribution business, all as more particularly described in Schedule A attached hereto;

(c) All of the Seller's leasehold improvements situated on its premises at 11959 Northrup Way, Bellevue, Washington;

(d) All of those prepaid expenses identified on Schedule B attached hereto;

(e) All of Seller's interest under that certain lease dated January 1, 1973, in which FISHER PROPERTIES, INC., is the Lessor affecting the Seller's premises at 11959 Northrup Way, Bellevue, Washington, as amended July 26, 1979 ("the Plant Lease");

(f) The trademarks "Societe" and "Imperial";

(g) All fuel oil in tanks owned by Seller;

(h) All right, title, and interest of Seller in and to that certain Microdata Minicomputer Reality System under Master Equipment Lease dated May 12, 1975 from Citicorp Leasing, Inc., and, subject to the provisions of Paragraph 25 hereof, the option to purchase said system at seven percent (7%) of its original installed cost at the termination of the lease term.

The purchase price for these assets was $2,004,751 against which Societe granted a $500,000 offset to the purchase price for certain deficiencies which both parties acknowledged existed in the roof of the premises subject to the lease and the assumption by Golden Grain of Societe's obligation under its lease to repair the roof. Golden Grain paid $1,504,751 to Societe, reflecting the purchase price less the $500,000 offset. The agreement provided as follows:

2. *Purchase Price.* The purchase price of the Assets shall be the sum of:

(a) $1,422,210.40 for the Inventory, such amount to be adjusted after the Date of Closing as provided in Paragraph 5.

(b) The total amount of the prepaid expenses listed on Schedule B, such amount to be adjusted after the Date of Closing as provided in Paragraph 23.

(c) The cost to the Seller of the fuel oil in tanks at the date of closing; and

(d) Three Hundred Eighty-nine Thousand and Fifty-nine Dollars ($389,059.00), such amount allocated among the Assets as follows: (i) $284,485 to Fixed Assets as described in Schedule A; (ii) $100,000 to Leasehold Improvements; and (iii) $4,574 to Trademarks of Seller.

Provided, that the total amount payable shall be adjusted as provided in Paragraphs 5, 6, 11, and 23 hereof. The purchase price of the Assets, less the amount of the adjustments provided in Paragraphs 6 and 11, shall be paid in cash at the closing.

    *      *      *      *      *      *      *

6. *Adjustment of Purchase Price.* The parties agree that there exist certain deficiencies in the roof of the building on the premises subject to the Plant Lease, that *Buyer has assumed full responsibility for the roof, and that Buyer will assume the responsibility of Seller to repair the roof under the terms of the Plant Lease.* In consideration thereof, Seller agrees to pay Buyer the amount of Five Hundred Thousand Dollars ($500,000.00), which amount may be offset by the amount payable by Buyer to Seller. Buyer shall indemnify and hold Seller harmless against and from any liabilities, costs, or expense arising out of any damage to property or injury to persons arising out of any defect or alleged defect in such roof. [Emphasis added.]

Societe assigned the plant lease to Golden Grain, and Golden Grain relieved Societe from all obligations under the lease as follows:

4. *Assignment of Plant Lease.* Seller shall assign the Plant Lease to Buyer and Buyer shall assume and hold harmless Seller against and from all obligations of the Seller thereunder as of the closing date. Seller shall not amend or agree to amend the Plant Lease without the prior written consent of Buyer.

On its 1979 Federal income tax return, petitioner reported an ordinary loss in the amount of $2,458,126 on the sale of the operating assets of Societe, computed as follows:

| | |
|---|---|
| Total cost or other basis | $6,362,986 |
| Less: depreciation allowed | (2,400,109) |
| Adjusted basis | 3,962,877 |
| Proceeds received | 1,504,751 |
| Net loss to line 10 | 2,458,126 |

Golden Grain spent the following amounts on roof repairs in 1979 and 1980:

| Expenditure | Date |
|---|---|
| $37,320.92 | Oct. 3, 1979 |
| 12,452.95 | Dec. 3, 1979 |
| 22,674.22 | Feb. 19, 1980 |
| 801.16 | Mar. 10, 1980 |
| 13,694.28 | Apr. 1, 1980 |
| 124,134.41 | July 1980 |
| 193.80 | Sept. 1980 |
| 119,765.85 | Oct. 1980 |
| 168,962.41 | Oct. 1980 |
| 500,000.00 | |

In his notice of deficiency issued to petitioner, respondent disallowed petitioner's deduction in 1977 for professional fees and settlements to the extent of $248,403 with the explanation that "no deduction is allowable for two-thirds of any amount paid with respect to judgments or settlement on account of violations of federal anti-trust laws." Respondent computed the $248,403 disallowed as follows:

| | American Bakeries Co. | ITT Continental Baking Co., Inc. | Interstate Brands Corp. | Total Adjustments |
|---|---|---|---|---|
| (1) Amount paid by all parties | $2,844,996 | [3]$114,039 | $500,000 | |
| Less: | | | | |
| (2) Litigation expense | 1,853,669 | 0 | 180,000 | |
| (3) Balance | 991,327 | 114,039 | 320,000 | |
| (4) Amount paid by Fisher in U.S. | 432,792 | [4]114,029 | 121,500 | |
| (5) Line (4) ÷ (1) | .152,124 | [5].100 | .24,300 | |
| (6) Line (5) × (3) | 150,805 | [4]144,029 | 77,760 | |
| (7) Line (6) × two-thirds | [6]100,537 | 96,026 | [6]51,840 | $248,403 |

In the notice of deficiency, respondent also determined that the amount received from the sale of certain operating assets by Fisher Services, Inc. (formerly Societe Candy Co.) was $2,004,751 rather than the $1,504,751 reported on petitioner's 1979 Federal income tax returns. Therefore, respondent increased petitioner's income by the amount of $500,000.

[3]According to the stipulation of facts, the total amount paid by all parties pursuant to the ITT agreement was $573,478.76, and the amount paid by petitioner after technical adjustments was $144,039.27.

[4]In the stipulation of facts, the parties agree that these figures should be $144,039.

[5]This obviously was intended to be 1.00.

[6]Through this computation respondent effectively apportioned $281,987 of the litigation expenses of American Bakeries to Fisher Mills ($432,792 – $281,987 = $150,805) and $43,740 of the Interstate litigation expenses to Fisher Mills ($121,500 – $43,740 = $77,760).

The first issue for decision is whether the two-thirds disallowance provision in section 162(g) applies to limit the deduction of payments made by Fisher Mills to settle the actions brought by American Bakeries and Interstate under section 4 of the Clayton Act after Fisher Mills' nolo contendere plea was accepted in a prior criminal proceeding where an injunction was not obtained. The determination of this issue depends on whether the deduction of any part of the payment is to be disallowed under the provisions of section 162(g) since prior to the enactment of that section, amounts paid as a result of litigation under section 4 of the Clayton Act in settlement of such litigation had been considered by respondent to be deductible. Also, in *Commissioner v. Tellier*, 383 U.S. 687 (1966), the Supreme Court had limited the circumstances in which otherwise business expenses might be considered as nondeductible because such deduction would violate public policy.

In *Commissioner v. Tellier, supra,* the Supreme Court held legal fees expended in an unsuccessful defense of a business-related criminal prosecution to be deductible. The Court stated, at pages 694–695, that disallowance is justified "only where the allowance of a deduction would 'frustrate sharply defined national or state policies proscribing particular types of conduct.'" The Court added that the "policies frustrated must be national or state policies evidenced by some *governmental* declaration of them." 383 U.S. at 694.

In the Tax Reform Act of 1969,[7] Pub. L. 91–172 (Dec. 30, 1969), the public policy doctrine as to deduction of payments in connection with antitrust law violation was clarified by the addition to the Internal Revenue Code of section 162(g) which provides:

SEC. 162(g). TREBLE DAMAGE PAYMENTS UNDER THE ANTITRUST LAWS.—If in a criminal proceeding a taxpayer is convicted of a violation of the antitrust laws, or his plea of guilty or nolo contendere to an indictment or information charging such a violation is entered or accepted in such a proceeding, no deduction shall be allowed under subsection (a) for two-thirds of any amount paid or incurred—

---

[7]For detailed discussion of the legislative history of this provision of the Tax Reform Act of 1969, see Wilberding, "New Tax Consideration Injected Into Antitrust Treble Damage Proceedings," 19 Kan. L. Rev. 441 (1971); Boland, "Income Tax Treatment of Antitrust Damages," 22 Tax L. Rev. 47 (1966).

(1) on any judgment for damages entered against the taxpayer under section 4 of the Act entitled "An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes", approved October 15, 1914 (commonly known as the Clayton Act), on account of such violation or any related violation of the antitrust laws which occurred prior to the date of the final judgment of such conviction, or

(2) in settlement of any action brought under such section 4 on account of such violation or related violation.

The preceding sentence shall not apply with respect to any conviction or plea before January 1, 1970, or to any conviction or plea on or after such date in a new trial following an appeal of a conviction before such date.

Although the Code does not define "related violation," section 1.162–22(c), Income Tax Regs., provides:

(c) *Related violation.* For purposes of this section, a violation of the Federal antitrust laws is related to a subsequent violation if (1) with respect to the subsequent violation the United States obtains both a judgment in a criminal proceeding and an injunction against the taxpayer, and (2) the taxpayer's actions which constituted the prior violation would have contravened such injunction if such injunction were applicable at the time of the prior violation.

Section 1.162–22(a), Income Tax Regs., provides that the two-thirds disallowance provision does not apply to "amounts attributable to the plaintiff's costs of suit and attorney's fees, to the extent that such costs or fees have actually been paid."

Petitioner contends that the entire payment made by Fisher Mills to American Bakeries was attributable to American Bakeries' costs of suit and attorneys' fees and therefore deductible under the provisions of respondent's regulation. Petitioner bases this contention on the statement contained in the letter from American Bakeries' attorney concerning the settlement agreement that $1,500,000 paid by Fisher Mills and four other named defendants would be allocated by American Bakeries first to the reimbursement of its attorneys' fees and litigation costs, with the remainder, if any, to be attributable to damages. Petitioner argues that the agreement of American Bakeries to make this attribution was part of the settlement and since American Bakeries' attorneys' fees and litigation costs exceeded $1,500,000, Fisher Mills paid no amount to American Bakeries for damages as defined in respondent's regulation issued under section 162(g).

Respondent contends that the payments Fisher Mills made to American Bakeries were characterized as reimbursement of the plaintiff's cost of litigation and attorneys' fees solely to enable petitioner to obtain a tax deduction. Respondent contends that part of the payment was damages nondeductible to the extent provided in section 162(g) and that petitioner's characterization of the damages as an "expense reimbursement" was made in an effort to obtain a tax deduction for an amount which in reality was damages. Respondent points out that the actual amount of the payment to be made to American Bakeries was determined long before Fisher Mills' attorney learned of the monetary amount of the fees and costs incurred by American Bakeries.

Respondent applied a proportional allocation to Fisher Mills' payments in order to determine the portion of each payment which should realistically be considered a deductible expense. Respondent computed that petitioner was entitled to deduct $281,987 of its reimbursement to American Bakeries and $43,740 to Interstate as reimbursement of each company's attorneys' fees and litigation costs.[8]

Respondent contends that two-thirds of the remaining portions of the payment by Fisher Mills to American Bakeries ($100,537) and $51,840 of the amount paid to Interstate are not deductible pursuant to section 162(g). In support of his position, respondent suggests that we ignore the definition of "related violation" found in the regulations and instead apply his preferred "economic objective" test. According to respondent, the term "related violation" means a violation committed to accomplish the same ultimate economic objective as the objective for the violation of which a taxpayer was convicted. In respondent's view, the "economic objective" test should be used in the context of substantial factual identity (other than dates) of both the criminal antitrust violation and the antitrust violation resulting in the civil suit for treble damages. Even though an injunction was not obtained in the instant case, respondent argues that the civil suit was based on a

---

[8]Petitioner does not contend that its entire payment to Interstate was a reimbursement of the plaintiff's attorneys' fees and litigation costs. Although not specifically so stated, petitioner apparently accepts respondent's allocation of the amount of Fisher Mills' payment to Interstate allocable to attorneys' fees and litigation costs. Respondent questions, however, petitioner's allocation of the payment in excess of attorneys' fees to the period after Jan. 27, 1972.

"related violation" to the violation of which Fisher Mills was convicted for purposes of section 162(g) because the same economic objective induced the acts for which Fisher Mills was convicted and the acts that formed the basis of the civil suit.

Petitioner[9] takes the position that the limitations imposed by section 162(g) on the deductibility of damages paid in an antitrust suit do not apply in the instant case because the payments made by Fisher Mills to American Bakeries were not attributable to damages resulting from a violation of antitrust laws for which Fisher Mills was convicted or a "related violation" pursuant to the definition of "related violation" found in sec. 1.162–22(c), Income Tax Regs. Petitioner argues that the payments made by Fisher Mills to American Bakeries in the amount of $432,791.80 and to Interstate in the amount of $121,500 are fully deductible. In the case of the American Bakeries payment, petitioner contends that the total amount represents deductible attorneys' fees and litigation costs. In the alternative, petitioner argues that the American Bakeries payment was not paid with respect to a violation of the antitrust laws or a related violation. Petitioner contends that to the extent that the payment to Interstate does not consist of the plaintiff's attorneys' fees and costs, it also was not made with respect to a violation of antitrust laws or a related violation.

We are unconvinced that the entire amount paid by Fisher Mills to American Bakeries represented amounts paid for litigation costs and attorneys' fees as claimed by petitioner. It is petitioner's burden to prove the part of the settlement payment that is allocable to attorneys' fees and litigation costs. *Bresler v. Commissioner*, 65 T.C. 182, 188 (1975); *Estate of Carter v. Commissioner*, 35 T.C. 326, 333 (1960).

To sustain this burden, petitioner relies solely upon the statements in a letter from American Bakeries' attorney that payment will be attributed first to the reimbursement of attorneys' fees and litigation costs, and the remainder, if any, is to be attributed to damages.

In letters dated June 29, 1977, and January 9, 1978, to Fisher Mills' attorneys from the attorneys for American

---

[9]Fisher Mills is a subsidiary of Fisher Co.'s, Inc., which is the petitioner in this case. In the interest of simplicity, we sometimes refer to Fisher Mills as the petitioner in discussing the arguments of the parties and our conclusion.

Bakeries, the statement is made that American Bakeries would attribute the amounts paid to it by Fisher Mills and four other defendants to attorneys' fees and litigation costs and would assist these companies in determining the amount deductible for their income tax computation. It is apparent to us that these letters were written solely for the purpose of enabling Fisher Mills and the other four defendants to claim a deduction for the amounts paid to American Bakeries in computing their taxable income. There is nothing in this record to show that the other defendants settling with American Bakeries did not consider their settlements to be in part allocable to American Bakeries' costs of litigation and attorneys' fees. So far as this record shows, Fisher Mills and the four other defendants whose payments American Bakeries agreed to attribute to litigation costs and attorneys' fees had no understanding with the other defendants that their payment would be allocated to such costs of American Bakeries to the exclusion of such other defendants having a proportionate part of such allocation. Petitioner, on this record, has totally failed to show error in respondent's allocation of the payment made by Fisher Mills to American Bakeries to litigation costs and attorneys' fees.

We therefore adopt the apportionment used by respondent to allocate the payments petitioner made between damages and attorneys' fees.

In order for the two-thirds disallowance provided in section 162(g) to apply to the portion of the payments allocable to damages, the statute and respondent's regulations require that the following elements exist:

(1) There must be a prior criminal proceeding in which the taxpayer was convicted of violating the Federal antitrust laws, or in which he entered his plea of guilty or nolo contendere to an indictment charging violation of the Federal antitrust laws. Sec. 162(g).

(2) There must also be a civil action brought under section 4 of the Clayton Act which provides that a plaintiff who prevails in an antitrust suit may also recover treble damages.[10]

---

[10]15 U.S.C. sec. 15 (1975). Sec. 4 of the Clayton Act provides in pertinent part: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * without respect to the amount in controversy, and shall recover threefold the damages by him sustained."

(3) The treble damage payments must be made to satisfy either a judgment rendered in the action brought under section 4 of the Clayton Act or must be in settlement of the action brought under section 4 of the Clayton Act on account of the criminal violation or a "related violation." Sec. 162(g)(1) and (2).[11]

(4) If the damages are paid in settlement of any action brought under section 4, Court proceedings must have been instituted by the plaintiff's filing his complaint for treble damages. Sec. 162(g)(2).

(5) The damage payments must not be attributable to reimbursement of litigation costs or attorneys' fees which are fully deductible. Sec. 1.162–22(a), Income Tax Regs.

In this case, neither party contends that the settlement did not result from a civil suit based on acts similar to the acts for which Fisher Mills was convicted of antitrust violations.[12] In fact, the record shows that it was. Petitioner, however, claims that the settlement, at least as to Interstate and either in whole or in part as to American Bakeries, was not for the years of its conviction and that there was no related violation under respondent's regulations.[13] Petitioner contends that all

---

[11]Criminal antitrust violations are subject to a 5-year statute of limitation period under 18 U.S.C. sec. 3282 (1979), while civil damage actions brought under sec. 4 of the Clayton Act are subject to a 4-year statute of limitation under 15 U.S.C. sec. 15b (1975). However, the civil statute of limitations may be tolled by fraudulent concealment of a conspiracy. As heretofore pointed out, sec. 1.162–22(c), Income Tax Regs., defines a "related violation" as requiring the United States to have obtained both a judgment in the criminal proceeding and an injunction against the taxpayer. Sec. 1.162–22(f), example (2), Income Tax Regs., considers the case where the Government has obtained an injunction and a criminal judgment against a taxpayer for activities occurring between 1965 and 1970, while the civil damage action was based on a conspiracy occurring during 1963, "a year barred by the applicable criminal statute of limitations," but for which the pleadings in the civil action "alleged that the civil statute of limitations had been tolled by the defendants' fraudulent concealment of their conspiracy."

[12]See example (3) of sec. 1.162–22(f), Income Tax Regs., which provides:

*Example (3)*. Assume the same facts as in example (1) [a conviction of antitrust violations with respect to electric transformers and an injunction with respect to price fixing of transformers] except that Z Co.'s claim for treble damages was based on a conspiracy to fix and maintain prices with respect to electrical insulators for high-tension power poles. Since the civil action was not based on the same violation of the Federal antitrust laws as the criminal action, or on a related violation (a violation which would have contravened the injunction if it were applicable), X Co. and Y Co. are not precluded by section 162(g) from deducting as a trade or business expense the entire $85,000 paid by each in settlement of the civil action.

[13]It is not clear from petitioner's argument that it does not concede that part of the payment with respect to American Bakeries was on account of the violation for which it was convicted if we hold as we have that the entire payment it made to American Bakeries was not in reimbursement of American Bakeries' attorneys' fees and litigation costs. Petitioner does contend that no part of the payment to Interstate was on account of such violation, since it claims that the entire payment was for the period subsequent to January 1972. Fisher Mills' criminal conviction was for the period from Aug. 15, 1967, to Dec. 31, 1969.

or a portion of its payments were for years other than the years for which it was convicted of a criminal act and that this portion of the payment was not with respect to a "related violation" because the United States did not obtain an injunction against Fisher Mills or any of the other indicted defendants on March 16, 1973, when Fisher Mills was convicted on its plea of nolo contendere of violating the Sherman Act during the period from August 15, 1967, through 1969.[14]

In the report of the Senate Finance Committee, it is stated that the disallowance is limited to the so-called "hard-core" cases where the defendant's conduct is so flagrant as to warrant criminal prosecution and where the defendant's intent has been clearly proved. The Senate Finance Committee report recommending adoption of the proposed legislation stated:

> The deduction is denied * * * only where there has been a criminal conviction (or a plea of guilty or nolo contendere) in a related case. This means that the deduction is to be denied only in the case of "hard-core violations" where intent has been clearly proved in a criminal proceeding. The denial of the deduction is limited to two-thirds of the amount paid or incurred since this represents the "penal" portion of the payment. The remaining one-third is to continue to be deductible on the grounds that it represents a restoration of the amount already owing to the other party. [S. Rept. 91–552 (1969), 1969–3 C.B. 597.]

Respondent's regulation disallowing a deduction of two-thirds of any treble damages for years other than the years for which the taxpayer is criminally convicted only if, in addition to accepting petitioner's nolo contendere plea, the Government also obtains an injunction against the antitrust violator, appears to be in accordance with the intent of Congress as expressed in the report of the Senate Finance Committee. The interpretation of the statute by the regulation, disallowing treble damage payments as "related" to a prior criminal violation only if a judgment and an injunction were entered in the prior proceedings, appears to implement the intent of the

---

[14]Sec. 1.162–22(c), Income Tax Regs., defines "related violation" as follows:

(c) *Related violation.* For purposes of this section, a violation of the Federal antitrust laws is related to a subsequent violation if (1) with respect to the subsequent violation the United States obtains both a judgment in a criminal proceeding and an injunction against the taxpayer, and (2) the taxpayer's actions which constituted the prior violation would have contravened such injunction if such injunction were applicable at the time of the prior violation.

statute which was to provide for a disallowance only in "hard-core" cases.

In our view, the injunction requirement in section 1.162–22(c) of the regulations reinforces the intent of Congress in enacting section 162(g) which was to deny a two-thirds deduction for treble damage payments only in the most flagrant violations of the Federal antitrust laws where the Government has proved the defendant's guilt beyond a doubt. In any event, respondent should be bound by his own regulations in circumstances such as those here present.[15]

We hold that the two-thirds disallowance provision in section 162(g) does not apply to the payments petitioner made to American Bakeries and Interstate for years other than the years involved in the criminal conviction which covered the period from August 15, 1967, to December 31, 1969. Section 162(g) does apply to the years for which Fisher Mills was criminally convicted since it specifically applies to a conviction on a nolo contendere plea.

The record shows that the period covered in Fisher Mills' conviction of an antitrust violation was from August 15, 1967, to December 31, 1969, or 28.5 months. Petitioner argues that, because of the decision of the District Court granting Fisher Mills' motion to dismiss the claims of Interstate for the period prior to January 27, 1972, and Interstate's agreement to attribute the payments made to it by Fisher Mills, first to the costs of the suit and attorneys' fees, and the remainder to the claim for damages for the period subsequent to January 27, 1972, no portion of the payment to Interstate is allocable to the period of the violation. For the same reason we stated in rejecting petitioner's claim that its entire payment to American Bakeries should be allocated to American Bakeries' costs of suit and attorneys' fees, we conclude that petitioner's contention that all of its payments to Interstate, other than that allocated to the costs of suit and attorneys' fees, should be

---

[15]This case involved a conviction on a nolo contendere plea which would ordinarily permit the company convicted to avoid having the plea constitute an admission in the subsequent litigation under sec. 4 of the Clayton Act. See *A.B. Dick Co. v. Marr*, 95 F. Supp. 83, 101 (S.D.N.Y. 1950). Since sec. 162(g) provides for disallowance of two-thirds of the treble damages on a conviction on a nolo contendere plea, it may be that in promulgating sec. 1.162–22(c), Income Tax Regs., respondent considered that at least in these circumstances for years other than the years of the conviction there was no clear violation of a clearly defined public policy absent the United States also obtaining an injunction.

attributed to the period subsequent to May 18, 1977, is without merit. The record in this case is clear, as petitioner recognizes in its alternative argument, that the actual settlement of this case and the mutual releases executed in connection therewith released any and all claims which "were or have been or could in any way have been alleged in the respective pleadings." The pleadings claimed damages for the entire period January 1, 1955, to March 15, 1974. Although petitioner's motions for partial summary judgment were granted and the claims of American Bakeries for the period prior to August 15, 1968, and claims of Interstate for the period prior to January 27, 1972, were dismissed, these decisions had not become final at the time of the settlement of these cases. In fact, both decisions were subject to appeal, and the record here shows that consideration was being given by the plaintiffs to appealing the decisions and also to moving for reconsideration of the granting of the partial summary judgment motions. Petitioner, in its alternative position, recognizes this fact and states that, if the payments made by Fisher Mills to American Bakeries are not to be classified as solely for attorneys' fees and costs, and the payments made by Fisher Mills to Interstate are not to be attributable solely to attorneys' fees and damage claims accruing after January 27, 1972, then the portion of the damage payments should be prorated to the violation in each instance on the basis of the percentage that the 28.5-month period encompassed in the violation for which Fisher Mills was convicted on its nolo contendere plea bears to the total months included in the claims made by American Bakeries and Interstate, based on the initial pleadings, rather than the remaining periods after the granting of Fisher Mills' motions for partial summary judgment.

Based on such an allocation, petitioner arrives at $18,096.58 as the portion of the payment to American Bakeries allocable to the period of the violation and $6,998.40 as the portion of the payment to Interstate allocable to the period of violation, with a resulting disallowance of $12,065.39 of the payment to American Bakeries and $4,665.60 of the payment to Interstate. Respondent, in his reply brief, does not question the method used by petitioner to arrive at the portion of the payment allocable to the violation, but merely argues that petitioner's alternative view fails "because the 'entire periods of the

alleged conspiracy' is comprised of 'related violation' conduct when the conduct occurred outside of the 28.5 month 'violation.' " Respondent concluded from this statement that the amounts "paid with respect to the 'related violations' are also subject to disallowance under section 162(g)."[16]

Since we have concluded that there was no "related violation" in the instant case under section 1.162–22(c) of respondent's regulations, we hold that the amount of damages attributable to the violation of antitrust laws by Fisher Mills paid to American Bakeries is $18,096.58, of which $12,065.39 is properly to be disallowed as a deduction under section 162(g), and that the portion of the payment by Fisher Mills to Interstate attributable to the violation by Fisher Mills of the antitrust laws is $6,998.40, of which $4,665.60 is to be disallowed under section 162(g).

The second issue is whether the two-thirds disallowance under section 162(g) applies to damages Fisher Mills paid to ITT prior to the commencement of a lawsuit by ITT under section 4 of the Clayton Act.

Respondent argues that the two-thirds disallowance applies to the payments Fisher Mills made to ITT even though section 162(g)(2) provides that the disallowance applies to payments made in settlement of "any action brought under section 4" of the Clayton Act. Although the settlement of ITT's claims against Fisher Mills occurred prior to the institution of a suit, respondent contends that we should look beyond the plain words of section 162(g) and hold that the two-thirds disallowance applies because permitting a deduction for petitioner's payments to ITT would violate the spirit of section 162(g). Respondent argues that defining deductibility in terms of whether or not a civil antitrust suit was filed is an unintended technicality that would defeat congressional intent.

Petitioner contends that the payments made to ITT are deductible in full because section 162(g) is only operative when a lawsuit is commenced. Petitioner points out that payments

---

[16]In fact, respondent in his reply brief makes the following statement:

It is interesting to note, and consistent with respondent's theory of the case, that petitioner states in support of its alternative theory:

"This allocation would be consistent with the mutual release executed upon the settlement which provided that in consideration of the payment, the parties released any claims which 'were or have been, or could in any way have been alleged in the respective pleadings * * * '"

Fisher Mills made to ITT were made solely on the basis of the ITT agreement and the payments were based on a formula derived from the amount of the payment the defendants made to American Bakeries when the case was settled. Since the ITT settlement did not follow the institution of "any action" by ITT, petitioner contends that none of the payments made fall within the two-thirds disallowance provisions of section 162(g).

We conclude that the payments petitioner made to ITT are not subject to the two-thirds disallowance imposed by section 162(g) because the payments were not made "in settlement of any action brought under * * * section 4" of the Clayton Act.

Section 162(g) was enacted for the purpose of disallowing deduction of two-thirds of the damages paid only in antitrust cases involving "hard-core violations where intent has been clearly proved in a criminal proceeding." S. Rept. 91–552 (1969), 1969–3 C.B. 423, 597. To deny a deduction of two-thirds of the damages paid in a situation where the parties have settled prior to the initiation of a lawsuit would discourage antitrust litigants from reaching a settlement prior to the initiation of costly litigation. The statute limits the disallowance to those instances where an action has been brought under section 4 of the Clayton Act.

We hold that Fisher Mills' payments to ITT are fully deductible since settlement was reached prior to initiation of any action by ITT. The use of the phrase "any action" in section 162(g)(2) makes the deductibility limitation turn on the filing of a complaint for treble damages, and in the absence of such a filing, we hold that petitioner's settlement payments to ITT are deductible in full as an ordinary and necessary business expense. Sec. 162(a); *Commissioner v. Tellier*, 383 U.S. 687 (1966); *Grossman & Sons, Inc. v. Commissioner*, 48 T.C. 15, 31 (1967) (deduction allowed for damages paid in settlement of civil suit by the United States under the False Claims Act which followed a related criminal suit because disallowance would not frustrate public policy); *Central Coat, Apron & Linen Service, Inc. v. United States*, 298 F. Supp. 1201 (S.D.N.Y. 1969) (deduction allowed for payment of legal fees incurred in defense of prosecution for antitrust law violation but deduction denied for payment of fine for antitrust law violation).

The final issue for decision is whether the purchaser's assumption of the lessee's leasehold obligation increases the lessee's amount realized upon the sale of its assets. Respondent argues that Societe was obligated to Fisher Properties, Inc., to repair the roof of the leased business premises by June 30, 1980, according to the amended lease which provided that the leasehold interest was subject to the repair obligation. Respondent contends that Societe was relieved of its repair obligation when Golden Grain purchased Societe's leasehold interest and therefore Societe realized income to the extent it was relieved of its obligation to repair the roof. Respondent states that the $2,004,751 purchase price of Societe's assets was composed of the $500,000 obligation of Societe assumed by Golden Grain plus the $1,504,751 cash payment by Golden Grain to Societe.

Petitioner contends that Societe's obligation owed to Fisher Properties, Inc., to repair the roof on the leased premises was not relieved or discharged as a result of Societe's sale of its assets to Golden Grain because Fisher Properties, Inc., did not relieve Societe of its roof repair obligation.

Pursuant to the sales contract dated July 27, 1979, between Societe and Golden Grain, Golden Grain assumed full responsibility for repairing the roof and assumed Societe's responsibility to complete such repairs under the terms of the plant lease. In consideration thereof, the contracting parties agreed to a $500,000 offset to the amount Golden Grain owed Societe for the purchase of Societe's assets. To the extent Societe was relieved of this obligation, Societe realized income. The purchase agreement specifically provides that in consideration of Golden Grain's assumption of Societe's responsibility to repair the roof pursuant to the terms of the July 26, 1979, lease, Golden Grain is to be credited the amount of $500,000 against the purchase price of Societe's assets. Thus the purchase price of Societe's assets was $2,004,751, not $1,504,751 as claimed by petitioner. Societe received the benefit of being relieved of its obligation to Fisher Properties, Inc., in the amount of $500,000. This relief from liability constituted a part of the amount received by Societe upon the sale of its assets.

We conclude that the discharge by Golden Grain of Societe's obligation to Fisher Properties, Inc., to repair the roof of the leased premises was equivalent to the receipt of $500,000 by Societe. See *Brown v. Commissioner*, 22 T.C. 147, 150 (1954),

affd. 220 F.2d 12 (7th Cir. 1955). Pursuant to the clear language of the sales contract, Golden Grain assumed Societe's obligation pursuant to the July 27, 1979, lease to repair the roof of the building. As we stated in *Brown v. Commissioner, supra* at 151: "Income may be realized in a variety of ways, other than by direct payment to the taxpayer, and, in such situations, the income may be attributed to him when it is in fact realized."

In *United States v. Hendler*, 303 U.S. 564 (1938), the Supreme Court held that if any amount of the taxpayer's liabilities are assumed and paid by a transferee, gain is recognized to the full extent of such assumption and payment. The Court stated (p. 566):

It was contended below and it is urged here that since the Hendler Company did not actually receive the money with which the Borden Company discharged the former's indebtedness, the Hendler Company's gain of $534,297.40 is not taxable. The transaction, however, under which the Borden Company assumed and paid the debt and obligation of the Hendler Company is to be regarded in substance as though the $534,297.40 had been paid directly to the Hendler Company. The Hendler Company was the beneficiary of the discharge of its indebtedness. *Its gain was as real and substantial as if the money had been paid it and then paid over by it to its creditors.* The discharge of liability by the payment of the Hendler Company's indebtedness constituted income to the Hendler Company and is to be treated as such. [Fn. ref. omitted; emphasis added.]

When Golden Grain assumed the responsibility for repairing the roof on July 27, 1979, Societe received a benefit in that Societe was no longer responsible for making such repairs. Therefore, we conclude that Societe realized income in the amount of $500,000 as a result of Golden Grain's assumption of Societe's repair responsibilities. See, e.g., *United States v. Hendler*, 303 U.S. 564, 566 (1938); *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 729 (1929).

Petitioner, in its brief, argues that the only theory upon which income could result to Societe from the assumption by Golden Grain of its obligation to repair the roof on the building it leased from Fisher Properties, Inc., is the relief of Societe of an obligation. Petitioner argues that since Societe's obligation was to another subsidiary of petitioner, there was no relief of an obligation outside the corporate family. Petitioner overlooks the fact that a company outside the corporate family assumed the obligation to spend $500,000 for roof

repair that otherwise would have required an expenditure by a member of the corporate family, Societe. Petitioner cites no authority for its contention that the relief by Golden Grain of Societe's obligation is not income to Societe, because the obligation of Societe was owed to another subsidiary of the parent of Societe, and we have found no authority to support this position of petitioner. Neither are we impressed with any logic to this position espoused by petitioner.

We conclude that respondent properly included the $500,000 obligation of Societe's assumed by Golden Grain in the amount received by Societe on the sale of its operating assets.

*Decision will be entered under Rule 155.*